THEODORE S. OCKELS AND ROSEMARIE G. OCKELS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ockels v. Commissioner
Docket No. 20810-83.
United States Tax Court
T.C. Memo 1987-507; 1987 Tax Ct. Memo LEXIS 503; 54 T.C.M. (CCH) 785; T.C.M. (RIA) 87507; September 29, 1987. Daniel S. Abrams, *506 Jeffrey L. Braun, and Saul Lieberman, for the petitioners. Ralph A. Eppensteiner and Arthur J. Gonzalez, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1978, 1979, and 1980 in the amounts of $ 16,518, $ 24,844, and $ 22,711, respectively. In his First Amendment to Answer, respondent asserted increased interest pursuant to section 6621(d)[1] (hereinafter referred to as section 6621(c), as redesignated by the Internal Revenue Code of 1986) on that portion of the deficiencies determined to be substantial underpayments attributable to a tax-motivated transaction: $ 8,171.26, $ 11,135.08, and $ 12,275.42 for 1978, 1979, and 1980, respectively. After concessions,[2] the issues for decision all relate to petitioner Theodore S. Ockels' (petitioner's) investment in Penguin Associates, a limited partnership in the business of owning and leasing computer equipment. The issues are: 1. Whether the partnership's transactions were supported by economic substance; 2. Whether the partnership was engaged in an activity for profit; 3. *507 Whether petitioner was at risk within the meaning of section 465 for his allocable share of the partnership's recourse indebtedness; 4. Whether the partnership properly determined its first taxable year for purposes of applying the half-year convention to its depreciation deduction; and 5. Whether petitioner's underpayments of tax were attributable to a tax-motivated transaction within the meaning of section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation *508 of facts and related exhibits are incorporated herein by this reference. At the time of filing the petition in this case, petitioners, husband and wife, resided in Lafayette, Cal. They timely filed Federal income tax returns for 1978, 1979, and 1980, and amended Federal income tax returns for 1978 and 1979, with the Internal Revenue Service Center in Fresno, Cal.
The Partnership
Penguin Associates (the Partnership) was formed in January, 1978, by Integrated Resources, Inc. (Integrated), [3] as a limited partnership under the Uniform Limited Partnership Act of the State of Connecticut. The general partners of the Partnership were IR-North Corporation (IR-North), a wholly-owned subsidiary of Integrated, and Sanford J. Merkin, the president of Merkin Associates, also a wholly-owned subsidiary of Integrated. IR-North and Sanford J. Merkin contributed in cash $ 651 and $ 6,512, respectively, as their capital contributions to the Partnership. The initial limited partner was Klaus Moses, an officer and director of Integrated. He contributed cash in the amount of $ 326 as his capital contribution to the Partnership. *509 In a private placement, the Partnership, though Kelly & Morey, Inc., a broker-dealer and a wholly-owned subsidiary of Integrated, offered for sale limited partnership interests aggregating a 98.85 percent interest in the Partnership. A confidential memorandum (the Confidential Memorandum) dated September 15, 1978, was prepared and distributed in connection with the offering of the limited partnership interest. A limited partner could acquire his Partnership interest by making a capital contribution in cash for the entire amount of his subscription or by electing to make capital contributions over a period of four years. Any limited partner who adopted the deferred capital contribution method was required promissory notes bearing interest at 8.5 percent per annum for the deferred amount and a letter of credit issued by such limited partner's personal bank as security for his notes. Pursuant to the offering, 17 limited partners other than the initial limited partner invested and contributed $ 643,710 as their aggregate capital contribution to the Partnership. On the completion of the offering, IR-North had a .1 percent interest, Sanford J. Merkin had a 1 percent interest, Klaus *510 Moses, the initial limited partner, had a .05 percent interest and the other limited partners had in the aggregate a 98.85 percent interest in the capital, profits, and losses of the Partnership. The Confidential Memorandum stated that the Partnership's investment objectives were the potential increase in equity in the computer equipment, through the amortization of loans used to purchase the equipment, a small cash flow during the term of the lease, increased cash flow at the end of the lease term upon the re-lease or sale of the equipment and the availability of current tax benefits. The Confidential Memorandum also contained discussions of the general economic, legal, and tax consequences of both the Partnership's activities and an investment in the Partnership. Schedule A of the Confidential Memorandum projected the tax effects of an investment in the Partnership. It indicated that the Partnership's investment in the computer equipment would generate tax losses from 1978 to 1983. Beginning in 1984, substantial taxable income would result, even though little net cash flow was expected from the computer lease and even if the computer equipment had no value at the expiration *511 of the lease. Schedule B of the Confidential Memorandum projected the cumulative economic effects, after tax, of an investment in the Partnership for investors in tax brackets of 55, 60, and 70 percent, using values of the computer equipment at the expiration of the lease (residual value) of 0, 20, 30, and 40 percent of the equipment's original cost. This schedule indicated that an investor's return was dependent on the residual value, and that an investor could expect an economic benefit from an investment in the Partnership, after tax, if the computer equipment retained a value of somewhere between 20 and 30 percent of the equipment's original cost. Although the Confidential Memorandum provided no assurance that the computer equipment would have any residual value, it contained an appraisal of the equipment by Harvey Berlent, an independent appraiser, stating that it was reasonable to expect that the equipment would have a value in excess of $ 1,147,500 (exactly 30 percent of list price) at the expiration of the lease. Schedules A and B of the Confidential Memorandum appear in Appendix A attached hereto. On November 30, 1978, the Partnership acquired an commenced the business *512 of owning and leasing computer equipment. The equipment was manufactured by the International Business Machines Corporation (IBM), and was designated by IBM and known generally as a 303X system, consisting of a 3033-U8 central processing unit, a console, and a power and coolant distribution unit (the Computer System). The Partnership's gross income and deductions were derived principally from owning and leasing this Computer System. The Partnership reported income and expenses on the accrual method of accounting and used the calendar year as its taxable year. Its books and business records consisted of checking account records and accountants' workpapers. Origin of the Partnership's Transaction
The Computer System was originally sold by IBM to Alanthus Corporation (Alanthus) on June 21, 1978, pursuant to an agreement to purchase. Alanthus' purchase price for the Computer System was IBM's list price of $ 3,825,000. This amount was paid in full on October 2, 1978. Pursuant to a Lease Agreement (the Litton Lease) dated May 26, 1978, and two related Letter Agreements, dated May 26, 1978 and June 22, 1978, respectively, the Mellonics Systems Development Division, Litton Systems, *513 Inc. (Litton), a wholly-owned subsidiary of Litton Industries, Inc., leased the Computer System from Alanthus. The Litton Lease was a net lease with an initial term of 36 months commencing on October 2, 1978, and continuing automatically thereafter for one month periods until September 30, 1986, unless terminated by either party pursuant to the termination provisions of the lease. The Computer System was installed in the Litton offices in Canoga Park, Ca., on June 26, 1978. [4]
Under the Litton Lease, rent was payable by Litton on the first day of the month, in advance, in the amounts of $ 65,080 for the first 48 months and $ 43,873 for the subsequent 48 months. If an upgrade (the Upgrade) to the Computer System was added, the Litton Lease provided for additional rent. [5] Litton Industries, Inc., guaranteed the payment and performance of Litton Systems under the Litton Lease. *514 The Computer System purchased by Alanthus and leased to Litton had originally been ordered from IBM by Litton. At the time that IBM announced the introduction of the IBM 3033 computers, in March 1977, Litton was using an IBM System 370 Model 168 computer with attached processor (370/168-AP) on lease from Alanthus. Litton ordered two IBM 3033 computers and related equipment shortly after IBM's announcement. Litton participated in IBM's "lottery" for first-day orders,[6] and secured an early delivery date, in June of 1978, for its computers. This was one of the first deliveries of the IBM 3033. Litton then negotiated with Alanthus to arrange for Alanthus to purchase the IBM 3033 computers from IBM on behalf of Litton and then lease them to Litton as end-user. Alan Shalov, president of Alanthus, handled the negotiations with Litton, although others were involved, such as Jerry Minsky, vice-president with responsibility for the computer leasing division. The negotiations actually involved several transactions. Because the lease of the 370/168-AP was being terminated early, a termination fee of $ 1.7 million was payable to the lender, and Litton *515 would normally be liable for that fee. Alanthus would ordinarily handle the remarketing of the 370/168 AP, retain a remarketing fee and turn over the remainder of the proceeds to Litton as an offset to the termination fee. The third transaction would be arranging the leases for the two 3033's. As a result of negotiations, in which Litton's early delivery positions were taken into account, Alanthus agreed to pay the $ 1.7 million termination fee itself, and to retain the entire proceeds of the remarketing. At that point in time Alanthus believed it could obtain $ 2.5-3 million on remarketing. [7] Because Litton did not want the investment tax credits available on the two 3033's, Alanthus gave Litton a credit for that amount. Finally, in determining the lease rate to be charged to Litton for the 3033's, Alanthus charged approximately $ 500,000 less per lease than it would otherwise have charged. [8]Alanthus expected to ultimately make a large profit on the whole deal, however, upon reselling the 3033's to leasing entities. *516 Of the 3033's acquired by Alanthus in this transaction, the larger of the two is the Computer System at issue here. Alanthus paid IBM $ 3,825,000 for the Computer System, and $ 3,600,000 for the second, smaller, 3033. Both of these amounts were IBM list price. In order to finance its acquisition of the Computer System, on June 22, 1978, Alanthus obtained from National Bank of North America (NBNA), an unrelated, third-party lender, a loan in the principal amount of $ 3,797,118.83 (the NBNA loan), $ 1,670,945 of which was recourse indebtedness. A promissory note in this amount, dated October 2, 1978, was executed and delivered by Alanthus to NBNA. The principal amount of the NBNA loan, together with interest thereon at the rate of 9 percent per annum, was repayable by Alanthus in 95 consecutive monthly installments, payable in advance, beginning November 1, 1978. The first 47 monthly installments equalled $ 64,880, and the next 48 equalled $ 43,673. The loan agreement, which was dated June 22, 1978, also provided that NBNA would lend to Alanthus up to $ 299,330.81 as an additional loan for acquisition of the Upgrade if notified in writing by December 26, 1978. Pursuant to *517 a security agreement between NBNA and Alanthus dated June 22, 1978, NBNA acquired a security interest in and lien on the Computer System (including the Litton Lease) and all guarantees of the payment and performance of the obligations of a lessee under any lease (including Litton Industries' guaranty), to secure the payment and performance of the obligations of Alanthus. Pursuant to Section 7.3 of the security agreement between NBNA and Alanthus, upon the occurrence of certain specified events of default, Alanthus would be personally liable for the entire outstanding balance of the NBNA loan. In addition, in the event of a foreclosure as a result of any event of default before January 1, 1983, Alanthus would be personally liable for the "Recourse Amount" (the outstanding principal amount due on January 1, 1983, less $ 125,600) offset by the proceeds of a foreclosure sale. Finally, if the Computer System were to be sold to a partnership, and Alanthus' obligation to repay were to be assumed by the partnership, to the extent that the partners in such partnership delivered to NBNA satisfactory personal guarantees of the Recourse Amount, such partnership would not be liable for *518 that amount, and the partners would be directly and personally liable to NBNA. Pursuant to an Assignment of Lease dated June 23, 1978, Alanthus assigned to NBNA all of Alanthus' rights, title, and interest in, to, and under the Litton Lease (including all rental payments due, and Litton Industries' guaranty) as security for Alanthus' payment and performance of its obligations under its promissory note and security agreement. Litton was obligated, pursuant to the Litton Lease, to perform its obligations under the lease to NBNA as assignee. On June 23, 1978, IRI, a wholly-owned subsidiary of Integrated, purchased the Computer System from Alanthus for $ 4,325.00. IRI also agreed to acquire the Upgrade from Alanthus if and when it was acquired by Alanthus. IRI's purchase was subject to the Litton Lease and subject and subordinate to any liens and security interest of IBM or NBNA. The negotiations between Alanthus and IRI that culminated in the June 23, 1978, purchase agreement were arms-length and took about 3 months to complete. IRI was represented in these negotiations by Stephen Goldsmith, a vice president of Integrated who had developed its equipment leasing division, and *519 who was also an officer of IRI. Alanthus was represented by Alan Shalov, Jerry Minsky, and Barry Shalov, outside counsel. The primary issue in the negotiations was the purchase price to be paid by IRI. Whether and how much of a premium would be paid by IRI for the early delivery position was central to that determination of the purchase price. Goldsmith's main areas of expertise were financial analysis and budgeting. While in charge of Integrated's equipment leasing activities, he analyzed potential investments by taking into consideration the following factors: the nature of the equipment, the proposed lease terms, the financing, the tax benefits, and the proposed residual value. Integrated leased all kinds of capital equipment, including aircraft, railroad equipment, and oil rigs. Approximately 10 percent of its leasing activity involved computers. The computer leasing transactions took place from 1977 to 1979. In evaluating the proposed transaction, Goldsmith sought the advice of experts with regard to the value of the Computer System, a fair premium for the early delivery position, and projected residual value. Alanthus furnished him with a letter from Comdisco, another *520 company involved in acquiring and leasing the IBM 3033, which stated that a 25-32 percent premium was common. An appraisal was also prepared for Integrated by Harvey Berlent, dated July 11, 1978, which would later appear in the Confidential Memorandum of the Partnership. That appraisal stated that the fair market value of the Computer System was $ 4,325,000 and that residual value as of September 1986 would be at least $ 1,147,500, or 30 percent of list price. Goldsmith may have seen a draft of this appraisal prior to closing. After analyzing the facts available to him and considering the opinions of others in the industry, he concluded that a 25-40 percent residual value at the end of the 8-year lease could be expected, and that it was fair for Integrated to pay Alanthus $ 500,000 over list price as a premium for the early delivery position. IRI's purchase price was payable as follows: (1) $ 5,000 in cash; (2) $ 458,001.17 by IRI's limited recourse promissory note; and (3) IRI's assumption, pursuant to an agreement dated June 23, 1978, of the outstanding balance of Alanthus' NBNA loan. IRI's promissory note was paid in full on October 4, 1978. IRI was also obligated under *521 its purchase agreement to pay Alanthus the sum of $ 531,127.83 as a brokerage commission. IRI signed a promissory note for that amount on June 23, 1978, and the note was paid in full on October 4, 1978. Pursuant to a security agreement between Alanthus and IRI dated June 23, 1978, Alanthus acquired a lien with respect to the Computer System and any leases covering it, including the Litton Lease. IRI's payment of its promissory notes in the principal amounts of $ 458,001.17 and $ 531,127.83, respectively, was secured under this agreement. The security interest was terminated as a result of IRI's payment of those amounts on October 4, 1978. Pursuant to a Management and Remarketing Agreement between IRI and Alanthus, dated June 23, 1978, Alanthus had the right to administer the Litton Lease on behalf of IRI and remarket the Computer System upon termination of the Litton Lease. In a guarantee agreement, also dated June 23, 1978, Integrated guaranteed to Alanthus IRI's obligations under the Management and Remarketing Agreement and certain of IRI's obligations under its purchase agreement. Alanthus made the investment tax credit available to IRI; however, IRI was unable to benefit *522 from it in 1978 due to net operating losses. The smaller 3033 acquired by Alanthus at the same time as the Computer System was also sold, to a leasing subsidiary of Merrill Lynch (Merrill Lynch). Merrill Lynch paid Alanthus $ 930,000 over and above the $ 3.6 million list price. This amount was designated as follows: an $ 850,000 premium, and an $ 80,000 lease brokerage fee. It is unclear from the record whether Merrill Lynch was entitled to the investment tax credit. The Merrill Lynch deal was finalized about one month before the IRI negotiations were completed. Including lease brokerage fees, Merrill Lynch paid Alanthus 25.83 percent over list price for its 3033 system ($ 930,000 over $ 3,600,000), and IRI paid Alanthus 26.95 percent over list price for the Computer System ($ 1,031,127.83 over $ 3,825,000). Although it had lost money on the remarketing of the 370/168-AP previously leased to Litton, Alanthus still netted about $ 300,000 in profit from all the combined transactions. The Partnership's Acquisition of the Computer System
On November 30, 1978, the Partnership purchased the Computer System from IRI, pursuant to a purchase agreement of the same date. The *523 purchase agreement was the result of "negotiations" within Integrated, which represented itself as well as the Partnership in its fiduciary capacity as general partner. Goldsmith again was involved in the transaction, as well as other officers of IR-North. Goldsmith recognized the conflict of interest involved, but did not seek a new independent appraisal of the transaction even though the Partnership's purchase took place 5 months after IRI's purchase of the Computer System. Goldsmith discounted any risk that the value of the Computer System or the early delivery position might have declined during that time after talking with others in the industry. The Partnership's purchase price for the Computer System was $ 4,325,000, payable to IRI as follows: (1) $ 392,757 in cash; (2) a subordinated limited recourse promissory note, dated November 30, 1978, in the principal amount of $ 208,200; [9] and (3) the Partnership's assumption, pursuant to an agreement dated December 1, 1978, of IRI's obligation to repay the outstanding balance (then $ 3,724,043) of the NBNA loan to Alanthus. The balance of the NBNA loan, with 9 percent interest per annum, was repayable by the Partnership in 93 *524 monthly installments commencing December 1, 1978. The first 45 installments were in the amount of $ 64,880 and the remaining 48 were $ 43,673. To meet its cash needs for the purchase of the Computer System the Partnership borrowed $ 650,000 from Chemical Bank on November 30, 1978. The loan was due on February 28, 1979. The Partnership repaid $ 180,000 of the loan in cash on December 21, 1978, and on February 28, 1979, borrowed another $ 470,000 from Chemical Bank and used the proceeds to pay off the balance of the first loan. The second loan was due May 29, 1979, and was also repaid, in part with the proceeds of a third loan made by Chemical Bank to the Partnership on March 20, 1979, in the amount of $ 463,500. The third loan was repaid on July 29, 1981. The Partnership's purchase agreement provided that the Partnership would purchase the Upgrade from IRI if it were available on or before June 1, 1979. *525 It was not available by that date and was therefore not acquired by the Partnership. The Partnership returned to the limited partners $ 50,278 of their capital contributions, and at that time revised Schedules A and B of the Confidential Memorandum to reflect the reduction in the limited partners' contribution. Pursuant to the Partnerships's purchase agreement, the Partnership also paid IRI a lease brokerage fee of $ 252,223 on November 30, 1978. The Partnership's Lease to IRI
Pursuant to an Agreement of Lease dated November 30, 1978, the Partnership leased the Computer System back to IRI for a term of 94 months, from December 1, 1978, until September 30, 1986. This lease (IRI Lease) was a net lease and was subject to the Litton Lease. Unlike the Litton Lease, the IRI lease contained no provisions for early termination. Rent was payable by IRI to the Partnership on the first day of each month, in advance, in the amount of $ 64,980 for the first 46 months and $ 43,773 for the remaining 48 months. [10] In order to secure its obligations under the IRI Lease, IRI assigned to the Partnership certain of its right as lessor under the Litton Lease (subject to the interest of NBNA). *526 A diagram of the completed transaction is attached hereto as Appendix B. Petitioner's Interest in the Partnership, the Limited Partner Guarantee, and Petitioner's Obligation to Make Additional Contributions to the Partnership
Petitioner acquired his interest in the Partnership on October 3, 1978 and was a limited partner in the Partnership on December 31 of each of the Partnership taxable years 1978 through 1985. At all times relevant to this proceeding, he had a 4.9425 percent interest in the Partnership's capital, profits, and losses. Petitioner acquired his Partnership interest by electing the deferred capital contribution method. His contribution were as follows: 1978
$ 6,435.50
1979
9,250.00
1980
8,500.00
1981
8,000.00
Total
[11] $ 32,185.50
*527 Petitioner paid interest on his deferred contributions to the Partnership as follows: 1979
$ 1,265.00
1980
1,402.00
1981
680.00
Total
$ 3,347.00
As required by the Limited Partnership Agreement and his Subscription Agreement, to secure his deferred capital contribution obligations, petitioner granted to the Partnership a security interest in his Partnership interest. As also required, to further secure his capital contribution obligations, petitioner delivered to the Partnership a letter of credit in the amount of $ 29,109.50 made by Wells Fargo Bank, petitioner's personal bank. Following the satisfaction of petitioner's deferred capital contribution obligations, the Partnership returned the letter of credit to him. Petitioner was also required to and did execute a Limited Partner Guarantee (the Guarantee) as a condition to his admission to the Partnership. The Guarantee stated that petitioner assumed personal liability for his pro rata share (4.9425 percent; $ 82,586) of the Partnership's recourse indebtedness ($ 1,670,945). In pertinent part, the Guarantee reads as follows: PENGUIN ASSOCIATES LIMITED PARTNER GUARANTEE
WHEREAS, the undersigned *528 is a limited partner of Penguin Associates, a Connecticut limited partnership (the "Partnership"). WHEREAS, the Partnership is personally liable under certain circumstances to National Bank of North America (the "Lender") for up to an aggregate amount, equal to the amount of the outstanding balance due on the loan due to the Lender as of December 31, 1982 reduced by $ 125,600 (the "Recourse Amount") under the terms and subject to the conditions and limitations, of Section 7.2 and 7.3 of a Promissory Note, Security Agreement (the "Security Agreement"), dated as of June 22, 1978, as amended, between the Lender and Alanthus Corporation ("Alanthus"), such Recourse Amount constituting a portion of the indebtedness under the Security Agreement. IRI Leasing Corp. ("IRI") had assumed the obligations of Alanthus under the Security Agreement in connection with its purchase of the Equipment (as such term is defined in the Security Agreement) from Alanthus. The Partnership has assumed the obligations of IRI under the Security Agreement accruing after December 1, 1978 in connection with its purchase of the Equipment from IRI. WHEREAS, each of the limited partners (the "Limited Partners") of *529 the Partnership, as a condition to their admission as Limited Partners, are required by the Partnership personally to guaranty a pro rata portion of the Recourse Amount. NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, receipt of which is hereby acknowledged, and subject to the conditions set forth below, the undersigned assumes personal liability for repayment of a portion of the Recourse Amount and guarantees to the Lender as follows:
1. Subject to the provisions of, and conditions and limitations set forth in, Paragraph 4 below, Sections 7.3 of the Security Agreement and Section 5(c) of the Limited Partnership Agreement (the "Partnership Agreement") of the Partnership, the undersigned hereby unconditionally guarantees to the lender, its successors and assigns, the due and prompt collection, in accordance with the terms thereof, of an amount up to 9.885% of the Recourse Amount per Unit of Limited Partnership Interest in the Partnership purchased by the undersigned. 2. This undertaking shall operate as a continuing guarantee and shall remain in full force and effect until January 1, 1983. In the event the Managing General *530 Partner requests an extension of the term of this guarantee pursuant to the terms of the Limited Partnership Agreement, this undertaking shall automatically remain in full force and effect until January 1, 1986. The undersigned's obligations hereunder are not contingent upon similar undertaking by other Limited Partners. The Lender may demand the undersigned's performance in whole or in part without regard to the undersigned's rights against coguarantors, but, in any event, the undersigned shall not be obligated for more than the product of (a) that portion of the Recourse Amount demanded by the Lender at the time of a default and (b) the undersigned's percentage interest in the profits and losses of the Partnership. * * * 4. If the assets of the Partnership securing the Recourse Amount pursuant to the terms of the Security Agreement shall not be sufficient to repay the Recourse event, the undersigned agrees to make special capital contributions to the Partnership, subject, as to the time and amount thereof, to the provisions of paragraphs 1 and 2 hereof and in accordance with Section 5(c) of the Partnership Agreement. The obligations of the undersigned to make special *531 capital contributions shall not in any way derogate from the right of the lender to proceed to enforce this Guarantee directly against the undersigned without first proceeding against the Partnership. It is understood and agreed that the aggregate of the amount of special capital contributions the undersigned shall be obligated to make and any amounts paid by the undersigned hereunder directly to the lender shall in no event exceed the undersigned's proportionate share of profits and losses in the Partnership. 5. This guarantee shall be binding upon the heirs, executors, administrators, legal representatives and assigns of the undersigned and shall be enforceable notwithstanding the insolvency, bankruptcy or dissolution of the Partnership. 6. The undersigned hereby authorized the Managing General Partner of the Partnership to act for and on behalf of the undersigned in all dealings with the Lender or co-guarantors in enforcing the obligations of the undersigned. In the event the undersigned defaults in the payment of his obligations hereunder, the Managing General Partner may institute legal action to enforce such payment, and the undersigned hereby assigns to the Managing *532 General Partner his right to all Partnership distributions after the date of such default as security for payment of his obligations hereunder. * * * [Emphasis added.] As stated in Paragraph 4 of the Guarantee, petitioner was obligated under Section 5(c) of the Limited Partnership Agreement to make a Special Contribution to the Partnership under certain circumstances. Section 5(c) of the Limited Partnership Agreement reads as follows: (c) The Special Contribution of each Partner signatory to this counterpart of this Agreement shall be as specified in the Schedule of Partners' Contributions attached to this counterpart and shall be made by each such Partner pursuant to special calls therefor made by the Managing General Partner, such calls for Special Contributions not to exceed, in any event, an aggregate amount equal to the product of such Partner's Distribution Percentage and the Aggregate Special Contributions. The obligation of the Limited Partner to make Special Contributions shall be subject to the conditions and limitations of, and shall be in accordance with, (1) the provisions of the Limited Partner Guarantee executed by such Limited Partner at the same time as he *533 has executed this Agreement and (ii) the provisions of the Loan Agreement. Under the terms of the Limited Partnership Agreement, petitioner had no right to reimbursement from either the Partnership or the general partners for amounts paid by him to the Partnership as a Special Contribution or to NBNA pursuant to the guarantee. Section 6(g) of the Limited Partnership Agreement provided that limited partners had no right to withdraw or reduce their contributions once made and section 7(f) of the Limited Partnership Agreement provided that the general partners were not liable to the limited partners for any loss or liability incurred, except if attributable to the willful misconduct or gross negligence of a general partner. By letter dated February 15, 1983, the Partnership notified petitioner that NBNA had modified the security agreement to extend the expiration date of the Recourse Amount to January 1, 1986. The Limited Partner Guarantee would therefore remain in full force and effect until that date. The Early Delivery Premiums
In March of 1977, IBM announced the introduction of the 3033, its newest, most advanced computer and the successor to the 370/168. IBM established *534 a "first-day order" lottery procedure for determining the sequence in which orders for the 3033 would be filled, since it was apparent that it would be several years before enough 3033's could be manufactured and delivered to meet the demand for them. Pursuant to this lottery system, all orders placed with IBM for 3033's within a specified number of weeks after the announcement were treated as first-day orders, and, unless they were entitled to priority treatment (such as certain defense contractors), delivery positions were then assigned on a random basis to the orders. IBM then notified those who had placed orders of their projected delivery dates, which ranged from April 1978 to 1981. IBM did not require a person placing an order for a 3033 to make a deposit or post any security at the time of placing the order or receiving the projected delivery date. Until some point after the results of the lottery had been announced, an order could be cancelled without penalty. For this reason, many of the orders for the 3033 were actually placed not by users or lessors of the 3033, but by speculators who planned to sell their delivery dates at a premium to those further back in the queue. *535 These speculators had neither the means nor the inclination to actually acquire a 3033 and if they did not receive favorable delivery dates they would cancel their orders without penalty. IBM attempted to curtail the speculation in delivery dates, and in May of 1977 established order certification and preliminary credit review procedures, whereby those who had placed orders had to certify their intention to own or use the 3033. This verification procedure could not and did not, however, eliminate all sales of favorable delivery positions, and in 1977 and 1978 a market developed in which premiums above IBM's list price were paid for rights to acquire 3033's pursuant to orders for which early delivery dates had been assigned. Actual premiums varied, depending on the date of the transaction and whether it was an outright sale of delivery date or a sale/lease transaction. A leasing firm might receive its premium through the lease rate charged to the end user. Actual transactions in 1978 included the following: Comdisco, Inc., engaged in eight transactions from may through December, 1978, in which it sold 3033's that it owned, subject to long-term (5-8 years) leases. The premiums *536 ranged from 24 percent to 34 percent over IBM's list price. Alanthus paid a premium of $ 1 million for a 3033 with an early delivery position in 1978, leased it to Northeast Utilities for $ 1.1 million, and sold the deal to Merrill Lynch. Computer Merchants, Inc., leased a 3033 to A. C. Nielsen Co. in December 1978 at a lease rate which represented a premium of 9 percent to 17 percent over IBM list price; this premium was divided between Computer Merchants, Inc., and Thomas Nationwide Computer Corporation, which had arranged the transaction. American Computer Group, Inc., (then the American Used Computer Corporation) ordered several 3033's from IBM, but ultimately only one order was exercised. That computer was leased on December 26, 1978, to Caterpillar Tractor Company, at a lease rate which represented a 21.6 percent premium over IBM list price. The earliest documented sale of a used 3033 was in April of 1980. however, by the end of 1978, early delivery premiums were already beginning to taper off slightly, due to increased deliveries of 3033's. Comdisco, Inc., found that premiums began to fall at that time, but by the end of the year they were still in the 24-25 percent *537 range. Alanthus sold two 3033's in December, 1978, for premiums of only $ 50,000 and $ 70,000, respectively. A December, 1978, research report by International Data Corporation stated that delivery premiums were still in the 10-15 percent range, and could run as high as 22 percent. Of the experts testifying at trial, all acknowledged that premiums were paid in 1978 for 3033's with early delivery positions, and most agreed that the fair market value of the 3033 in this case was above list price as a result of such premiums. Esmund C. Lyons, Jr., of SRI International, a research firm, stated that a 12-15 percent premium was reasonable. Svend E. Hartmann, of Computer Merchants, Inc., which publishes the Computer Price Guide, stated that premiums of $ 300,000 to $ 500,000 above list price were typical in 1978. In his opinion, the fair market value of the 3033 in this case would be between $ 4,398,750 and $ 4,972,500, taking into account a 10 to 15 percent early delivery premium and a 5 to 15 percent lease premium. Harvey Berlent, who had furnished an appraisal to Integrated, believed that fair market value was $ 4,325,000, or $ 500,000 over list price. Comdisco, Inc., which *538 had furnished an opinion to Stephen Goldsmith during the Alanthus-IRI negotiations, set fair market value at 125-132 percent of list price. Frederic G. Withington, of Arthur D. Little, Inc., testified that he was aware of premiums paid for early delivery positions in 1978, in amounts up to about $ 100,000. In his opinion, however, the fair market value of the 3033 purchased by the Partnership was only 90 percent of list price, because the investment tax credit was unavailable to the Partnership. S. Paul Blumenthal, of American Technology Appraisal Service, a division of American Computer Group, Inc., testified that premiums were paid in 1978 and that they would be reflected in the lease rate charged. His own company had entered into one such transaction, described above. With respect to the Partnership's transaction, however, he testified that fair market value was IBM list price. Residual Value
The Confidential Memorandum warned potential investors that because of the offsetting tax losses and taxable income over the term of the investment, their return on their investment was dependent upon the residual value of the Computer System on September 30, 1986. It was anticipated *539 in 1978 that the Partnership could realize a profit on its investment in the Computer System, aside from any tax considerations, if the Computer System's residual value as of September 30, 1986, when the Litton Lease and IRI Lease would expire, was in excess of $ 948,162, or 24.8 percent of IBM's list price as of November 30, 1978. [12]
Depending on the Computer System's residual value as of September 30, 1986, the Partnership would realize a profit on its investment in the Computer System, irrespective of tax considerations, as follows: Residual Value
(% of IBM List Price
Profit
25%
$   7,684
30%
189,371
40%
552,746
*540 In June of 1978 Stephen Goldsmith believed the residual value of the Computer System would be between 25 percent and 40 percent of the 1978 IBM list price. He did not revise his estimate at any time prior to November 30, 1978. In his appraisal dated July 11, 1978, Harvey Berlent, a major and active dealer of IBM computer equipment, expressed his opinion that the Computer would have a useful economic life of at least 12 years, and that on September 30, 1986, its fair market value would be in excess of 30 percent of list price. According to Frederic G. Withington of Arthur D. Little, Inc., which had prepared forecasts of future values of the 3033 in August 1978, on September 30, 1986, the residual value of the Computer System should have been between 12 percent and 25 percent of the 1978 IBM list price, with the midpoint, 19 percent, the most likely. In the spring of 1978, American Technology Appraisal Service published a study that predicted that in July of 1986 the residual value of the 3033 would be about 32 percent of its 1978 list price, or probably in the range of 27 percent to 37 percent. Later in 1978 this report was withdrawn, and for new forecasts of the residual value *541 of the 3033 were published in 1978, due to internal disagreement within the company regarding residual values. At trial, S. Paul Blumenthal of the company testified that a residual forecast of 17 percent ( or a range of 12-22 percent) would have been correct in November, 1978. Esmond C. Lyons, Jr., testified that in his opinion, as of November, 1978, the 3033 would have a residual value of 25 percent to 40 percent of list price on September 30, 1986, assuming it followed the product life curve of its predecessors. The December, 1978, report of International Data Corporation predicted a 22 percent residual value for the 3033 in January, 1986, and a 13 percent residual value in January, 1987. Throughout 1978, rumors abounded in the computer industry about new IBM product announcements. IBM's secrecy regarding its research and development of such products, combined with the sensitivity of the market value of existing computers to new technology, generated such rumors. During 1978 the industry speculated about the possible announcement of a new middle-level system by IBM referred to as "Series E." The middle-level computer did not appear to be competition for the 3033, which was *542 a top-of-the-line system. Moreover, IBM had previously announced its policy that future changes in its technology would be "evolutionary," not "revolutionary." The industry was therefore generally unprepared for the IBM Series E, which turned out to be the 4300, announced in January, 1979. The announcement revealed a drastic improvement in IBM's marketing strategy, that was much greater than anything rumored in 1978. The result was an immediate and drastic adverse effect on the industry's perceptions of the present and likely future market values of all prior computers, including the 3033. A report published in 1979 by American Technology Appraisal Service, following the announcement of the 4300, predicted that the 3033 would have a new value of 9 percent of list price in 1986 (an 8 percent to 18 percent fair market value, less a 27 percent to 32 percent cost of sale). The Partnership's Income and Expenses
The Partnership's items of income and expense, as reported on its Federal income tax returns for the years 1978 through 1984, are as follows: Amortization
Taxable
Rent
Interest
Interest
Depre-
of Lease
Income
Year
Income
Income
Expense
ciation
Brokerage Fee
Misc.
(Loss)
1978
$  64,980
$  3,418
$  33,066
$ 432,500
$ 2,683
$ 20,011
$ (419,862)
1979
779,760
33,946
359,133
865,000
32,199
500
(443,126)
1980
779,760
19,784
301,541
865,000
32,199
500
(399,696)
1981
779,760
6,460
240,441
865,000
32,199
500
(351,920)
1982
716,139
--  182,683
865,000
32,199
1,559
(365,302)
1983
525,276
-- 143,376
432,500
32,199
9,369
(92,168)
1984
525,276
--  106,492
--   32,199
500
386,085 *543 Petitioner's distributive share (4.9425 percent) of Partnership items, as reported on the petitioners' joint Federal income tax returns for 1978 through 1984, is as follows: Partnership
Interest
Total Income
Year
Income (Loss)
Expense
(Loss)
1978
($ 19,117)
$  1,635
($ 20,752)
1979
(4,152)
17,750
(21,902)
1980
(4,851)
14,903
(19,754)
1981
(5,510)
11,884
(17,394)
1982
(9,026)
9,029
(18,055)
1983
2,531 7,086
(4,555)
1984
24,346 5,263
19,083 In his statutory notice of deficiency dated April 15, 1983, respondent disallowed petitioners' 1978, 1979, and 1980 losses and deductions for investment interest expenses relating to the Partnership. Respondent determined that the Partnership losses were not allowable because petitioners had not established that the Partnership's transactions were bona fide arm's-length transactions at fair market value, that they were entered into for profit, or that they had economic substance other than the avoidance of taxes. The deductions for investment income expenses were disallowed because, according to respondent, petitioners had not established that the Partnership's transactions were *544 bona fide arm's-length transactions at fair market value, that a bona fide debtor-creditor relationship exists, or, if such a relationship exists, that the expenses were incurred and expended for the items claimed. OPINION We must decide whether petitioner is entitled to deduct his distributive share of Partnership losses and interest expenses for the years in question. Petitioner bears the burden of proof with respect to the deficiencies. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Respondent bears the burden of proof with respect to the issue of increased interest first raised in his amended answer. Rule 142(a). Respondent's position in this case is that the Partnership's ownership of the Computer System should be disregarded for tax purposed because the computer leasing transaction was a tax avoidance scheme totally lacking in economic substance. In support of his position, respondent argues that the Partnership never acquired the benefits and burdens of owning the Computer System, the Partnership never had an equity investment in the Computer System, the Partnership's purchase and lease of the Computer System was not motivated by a valid business *545 purpose and did not offer petitioner any potential for economic gain, and the Partnership's transactions do not satisfy the tests of substance established by the Supreme Court in Frank Lyon Co. v. United States,435 U.S. 561 (1978). Respondent also argues that the Partnership was not engaged in an activity for profit within the meaning of section 183 and that petitioner never was "at risk" within the meaning of section 465 for any amount in excess of his cash contribution. Respondent further argues that the Partnership is not entitled to a half-year's depreciation for 1978 as its taxable year did not commence until November 30, 1978. Lastly, respondent argues that the Partnership's purchase and lease of the Computer System was a tax-motivated transaction within the meaning of section 6621(c), and that petitioner is therefore liable for increased interest under that section. Petitioner contends that the Partnerships's transactions should be recognized for tax purposes and that the Partnership is entitled to all of the tax benefits afforded the owner of the Computer System. Petitioner argues that the Partnerships's purchase and lease of the Computer System was motivated *546 by business purpose and supported by economic substance, that the Partnership acquired the benefits and burdens of owning the Computer System, that the Partnership had an equity investment in the Computer System, and that the Partnerships's transactions were engaged in for profit within the meaning of section 183. Petitioner also asserts that he was at risk within the meaning of section 465 for an amount sufficient to permit him to deduct his distributive share of Partnership losses and interest expenses for each of the years in question. Petitioner further claims that for purposes of the half-year convention of computing depreciation, the Partnerships's taxable year commenced in January, 1978. Lastly, Petitioner argues that the Partnerships's transactions were not tax-motivated and that he is not liable for increased interest under section 6621(c). For the reason set forth below, we hold for Petitioner on all issues but one. On the issue of computing allowable depreciation, we hold that respondent has correctly applied the half-year convention. Following the submission of briefs in this case, we decided Gefen v. Commissioner,87 T.C. 1471 (1986). That case *547 involved many of the same principals and a similar computer leasing transaction. In Gefen, we held that the partnerships's transactions were supported by economic substance; that the partnerships's purchase and lease of the computer equipment in question were activities engaged in for profit; and that the taxpayer was "at risk" within the meaning of section 465 for her pro rata share of the partnerships's recourse indebtedness. We therefore held that the taxpayer was entitled to deduct her distributive share of partnership losses and interest expenses for the years in question. Petitioner submitted a letter to the Court urging us to decide this case on the basis of Gefen, and pointing out the various similarities between the two cases, in brief: (1) the computer system involved, which in Gefen was the IBM 370/168, the immediate predecessor the the IBM 3033; the structure of the transaction, which in both cases involved a sale and leaseback of the computer system by a limited partnership, third party institutional borrowing, and a limited partner guarantee of his pro rata share of the partnerships's indebtedness; and the fact that in both cases, the possibility of economic *548 profit hinged upon the residual value of the equipment at the end of the lease term. Pursuant to the Court's request, respondent submitted a response, in which he pointed out some differences between the two cases, essentially: (1) the transaction in Gefen was completed in 1977, whereas the transaction in this case was closed in November, 1978, when the announcement of IBM's 4300 series was imminent and was anticipated by the industry; (2) the case involves an intermediate entity (IRI) not present in the Gefen transaction, and the transaction between the Partnership and IRI was not arm's length; and (3) there was no payment of a "premium" for the computer system in Gefen, which the Partnership in this case supposedly paid and which had the effect of increasing the cost of the Computer System and in turn requiring a greater residual value in order to break even (the breakeven point in this case is approximately a 24.8 percent residual value, while in Gefen only a 14 percent residual value was required). We have considered the parties' submissions and we agree with respondent that there are salient differences between the facts of these cases. Therefore, the result *549 in Gefen does not necessarily compel a decision in favor of petitioner in this case. Respondent fist attacks this transaction as lacking economic substance. Respondent contends this transaction does not meet the tests laid out for true sale-leaseback transactions by the Supreme Court in Frank Lyon Co. v. Commissioner,supra. In that case, the Court stated that the form of the transaction should be respected where "there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations and is not shaped solely by tax avoidance features with meaningless labels attached * * *." Frank Lyon Co. v. Commissioner,supra at 583-584. Among other things, respondent states that the Partnerships's purchase and leaseback of the Computer System was merely a tax shelter appendage to the Alanthus-Litton deal; that it was a one-party transaction, wherein one Integrated subsidiary sold to another Integrated subsidiary, rather than a genuine multi-party sale-leaseback; that there was no business purpose for the transaction; that the Partnership was not the true owner *550 of the Computer System; and that there was no realistic possibility of profit. Where a transaction is entered into without any purpose other than to obtain tax benefits, the form of the transaction will be disregarded and the tax benefits denied. Law v. Commissioner,86 T.C. 1065, 1093 (1986); Estate of Thomas v. Commissioner,84 T.C. 412, 432-433 (1985). However, the fact that a transaction generates tax benefits for investor does not necessarily mean that the transaction lacks economic substance. Frank Lyon Co. v. United States,supra at 581 (1978); Gefen v. Commissioner,supra at 1490; Estate of Thomas v. Commissioner,supra at 432. If a transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits, the transaction has economic substance and will be recognized for tax purposes. Estate of Thomas v. Commissioner,supra at 438; Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 203 n. 17 (1983), affd. on this issue F2d 89 (4th Cir. 1985). We reject respondent's contentions that the Partnerships's *551 transactions lacked economic substance. Most importantly, we find that the Partnerships's transactions offered a reasonable opportunity for economic profit. We find that in November of 1978, when the Partnership acquired the Computer System, it was reasonable to believe that it would have a residual value in September, 1986, of at least 25 percent of list price, which would be sufficient to yield an economic profit on the Partnership's investment. We find that for the most part, there was not great disagreement among the expert witnesses on this point. Lyons' prediction of residual value was 25-40 percent, and Berlent's was 30 percent. Withington, who testified for respondent, predicted a likely residual value of 19 percent but admitted on cross examination that there was about a 10 percent chance that the residual value could be 25 percent. Blumenthal, respondent's other expert, worked for American Technology Appraisal Service, which had predicted a residual value of 32 percent; although that report was withdrawn prior to November of 1978, no new forecasts were published until 1979. [13] Only the report of International Data Corporation predicted a lower residual value, and this *552 report was not published until December, 1978. Our review of these experts' testimony leads us to conclude that in 1978 a forecast of an eighth year 25 percent residual value for the Computer System was reasonable. We note that in their eighth year of availability, two of the 3033's predecessors still had high residual values; 42 percent of list price for the 360/65 computer (in 1972) and a range of 25-41 percent of list price for the 370/165 (in 1978). Goldsmith's belief that the residual value of the Computer System at the end of the Litton Lease would be in the 25-40 percent range was generally in line with the forecasts of industry experts. Although on brief respondent makes much of the fact that Goldsmith did not obtain any new independent appraisal of the Computer System between July, 1978 and November, 1978, and did not reconsider *553 his original opinion s to residual value before the Partnership entered into the transaction, the evidence indicates that conditions had not yet change as of November, 1978, and industry forecasts still remained as they had been in the spring and summer of 1978. Not until the IBM 4300 was announced in early 1979 was the value of the 3033 adversely affected, and this was an unexpected, unpredicted event. [14] Therefore, Goldsmith's assessment of residual value was reasonable.
The fact that the Partnership's investment had reasonable profit potential constitutes the requisite economic substance. [15]Gefen v. Commissioner,supra at 1492; Estate of Thomas v. Commissioner,supra at 437; Rice's Toyota World, Inc. v. Commissioner,supra at 203 n. 17. *554 Respondent argues that the Partnership's transactions were merely a tax shelter appendage to the original deal between Alanthus and Litton, and further, that tax avoidance features dominated the transaction. In support of this argument, respondent points to a one-page internal memorandum by an officer of Integrated stating that this investment was a tax oriented vehicle and that tax losses would be available to investors. Respondent further notes that the Confidential Memorandum states that the investment is suitable for high tax bracket investors who can take advantage of the losses. We disagree with respondent's statement that the sole purpose of this transaction was tax-avoidance. First, we already have found that there was a reasonable possibility of economic profit here. Second, while it is true that the Partnership's transactions offered investors tax savings in the early years, in later years the depreciation and interest deductions were projected to be less than the income from the lease, and investors would start to pay tax on this "phantom income." [16] Further, it would not have been prudent to abandon the investment after the early years. The Partnership remained *555 liable on the NBNA loan, which the limited partners had guaranteed, and the rental stream from IRI, which could not terminate its lease early, would continue in any event. We conclude that while tax losses in the early years certainly must have made this investment more attractive they were not the primary motivation for the limited partners' investment. Moreover, we do not find it particularly significant that officers within Integrated, preparing to offer this investment for sale, should recognize that it would generate tax losses. As for the Confidential Memorandum, Federal and state securities laws require full disclosure of all material information, including tax consequences of an investment. It was therefore reasonable and normal for the Confidential Memorandum to have contained the language respondent complains of. See Estate of Thomas v. Commissioner,supra at 437. Respondent also argues that this was not a genuine multi-party transaction, but merely a one-party transaction involving Integrated alone. We agree with petitioner that this was not the case. Although negotiations *556 between IRI and the Partnership were not and could not have been arm's length, nonetheless they resulted in a true sale-leaseback between two parties. The terms of that sale-leaseback reflected to a large extent the various arm's-length transactions that preceded it, involving Alanthus, Litton and NBNA, all unrelated third parties. From looking at the whole picture, beginning with the Alanthus-Litton negotiations, and not just focusing on the IRI-Partnership deal, as respondent urges, we conclude that this transaction involved multiple parties and should be respected for tax purposes. Respondent further urges that we find that the Partnership did not acquire sufficient benefits and burdens to be considered the owner of the Computer System, citing Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981). In that case, the Court held that whether the benefits and burdens of ownership had passed was a question of fact to be ascertained from the intention of the parties as evidenced by written agreements in light of surrounding facts and circumstances. The following factors are to be considered in making this determination: (1) whether legal title passes; (2) *557 how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss and damage to the property; and (8) which party receives the profits from the operation and sale of the property. In considering these factors, we note first that the Partnership held legal title to the Computer System since November 30, 1978, and all formalities were properly observed with respect to the form of the transaction. The other factors of particular relevance here are the third, seventh, and eighth factors. In determining whether the Partnership acquired equity in the Computer System, we must determine whether the Partnership paid fair market value for the asset. A great deal of evidence was offered by both parties on this point. Petitioner maintained that a substantial market existed at the time of the Partnership's purchase which justified the payment of a $ 500,000 "early delivery *558 premium," or about 13.1 percent over list price. Respondent's position was that fair market value was not in excess of IBM list price. After hearing the testimony of both parties' witnesses, and reviewing the documents offered in support of their respective positions, we conclude that substantial premiums were indeed being paid at that time for immediate delivery of IBM 3033 computers, and that $ 500,000 was not outside of the range of reasonable premiums. In addition, the testimony indicated that the lease brokerage feed paid by the Partnership (approximately 6.6 percent of list price) was also reasonable given the value of the asset and the lease. We also note that the amount paid by the Partnership was close to the amount paid by IRI for the Computer System after lengthy, arm's-length negotiations. Although IRI did receive the investment tax credit in its transaction, we nevertheless find that the Partnership did not pay more than fair market value for the Computer System, and acquired an equity interest in it. We also find that the Partnership bore the risk of loss and profit from the property, as it would be the beneficiary of the profit realized on the sale or re-lease of the *559 Computer System at the end of the Litton lease. The amount of such profit depended on residual value. We therefore conclude that the Partnership has met the tests set forth in Grodt & McKay Realty, Inc. v. Commissioner,supra, and is to be considered the owner of the Computer Systems. Having rejected all of respondent's arguments, we hold that the Partnership's transactions are to be respected for tax purposes. The transaction had economic substance and afforded a reasonable opportunity for profit; the Partnership did not enter into the transaction solely for tax avoidance purposes; it was a genuine, multi-party transaction; and the benefits and burdens of ownership of the Computer System did pass to the Partnership. We conclude that the tests set forth by the Supreme Court in Frank Lyon Co. v. Commissioner,supra, have been satisfied. Respondent also determined that the Partnership's transaction was not an activity engaged in for profit, under section 183, and that deductions relating to the investment should therefore be disallowed to the extent they exceed gross income. Respondent states that the Partnership must have a bona fide objective of making *560 a profit in order to meet the test of section 183 and the regulations thereunder. Section 183(a) provides the general rule that where an individual is engaged in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." In determining whether an investment by an individual in a limited partnership constitutes an activity for profit within the meaning of section 183, the issue must be determined at the partnership level on the basis of the activities of the partnership. Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The question here is whether the Partnership was engaged in an activity during the years in question that constituted a trade or business so that the expenses incurred in connection with the activity would be deductible under section 162. An activity is a trade or business or purposes of section 162 if it is carried on with continuity and regularity and the taxpayer's primary purpose for engaging in the activity is for income or profit. Commissioner v. Groetzinger, 480 U.S.   *561 (1986). The expectation of profit need not be a reasonable one, but there must be a bona fide objective of realizing a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The issue of whether there is an objective to make a profit is one of fact to be resolved on all the facts and circumstances of the case, and the burden of proving the requisite objective is upon petitioner. Some of the factor that may be helpful in determining whether an activity is engaged in for profit are set forth in section 1.183-2(b), Income Tax Regs.
On the record before us we have no difficulty in concluding that the Partnership purchased and leased the computer equipment with the objective of making a profit. The record establishes that not only that it was reasonably possible that the Partnership's activities would return a pre-tax profit to the Partnership, but that those who represented the Partnership worked to insure that the Partnership would realize that profit. The record establishes that the Partnership engaged in its activities with the primary purpose and objective of making a profit. It follows that *562 petitioner's deductions of the distributive share of partnership losses and interest expenses are not subject to the limitations of section 183. The next issue to be decided is whether petitioner was at risk within the meaning of section 465 for his allocable share of the Partnership's recourse indebtedness, so that he can deduct his distributive share of Partnership depreciation and interest. Respondent sets forth two arguments in support of his position that petitioner was not at risk for this amount. First, respondent argues that petitioner was a mere guarantor of the Partnership's recourse indebtedness, and not ultimately liable for his pro rata share. As a mere guarantor, petitioner would not be considered at risk within the meaning of section 465 for his share of the Partnership's indebtedness. Brand v. Commissioner,81 T.C. 821 (1983). On this question, the relevant facts do not differ from those of Gefen v. Commissioner, supra, in which respondent made this same argument. We will herefore follow the reasoning of and the result reached in that case as to this issue. Section 465(a) provides that in the case of certain taxpayers engaged *563 in an activity to which section 465 applies, losses from the activity for a taxable year will be allowed up to the aggregate amount that a taxpayer is at risk for such activity at the close of such taxable year. Section 465(b)(1) provides that a taxpayer is at risk for money contributed to the activity, and section 465(b)(2) provides that a taxpayer is at risk for amounts borrowed for use in the activity to the extent that the taxpayer is personally liable for the repayment of such amounts. However, section 465(b)(4) provides that a taxpayer is not at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, or similar arrangement. Petitioner does not argue that section 465 does not apply to this investment. Petitioner entered into legally enforceable contracts making him personally and ultimately liable for his pro rata share of the Partnership's indebtedness to NBNA. These agreements consisted of the Limited Partner Guarantee and the Limited Partnership Agreement. Under the Limited Partner Guarantee, petitioner assumed personal, direct liability for his share of the Partnership's recourse indebtedness ($ 82,586), and he consented to be *564 sued directly by NBNA for the portion of the indebtedness he assumed regardless of whether NBNA first processed against the Partnership. The NBNA loan was a genuine indebtedness. NBNA was a third-party, institutional lender, and the loan was negotiated with Alanthus at arm's length. The Partnership assumed IRI's obligation to repay the balance of the NBNA loan, and was responsible for 93 monthly payments regardless of whether IRI, the lessee, paid its monthly rent or defaulted. In the event NBNA chose to proceed against the Partnership for the recourse indebtedness, petitioner was liable under the Limited Partnership Agreement to make a Special Contribution to the Partnership in an amount up to $ 82,586, his pro rata share of the recourse indebtedness. Petitioner would be required to make this Special Contribution if the Partnership defaulted on the NBNA loan, NBNA brought an action against the Partnership, and the Partnership's assets were not sufficient to repay the amount due. The amount of petitioner's Special Contribution would then be applied by the Partnership to the obligation owed to NBNA. Under the terms of the Limited Partnership Agreement, petitioner had no right *565 to reimbursement from either the Partnership or the general partners for amounts paid by him to the Partnership as a Special Contribution or to NBNA pursuant to the Guarantee. In addition, the Limited Partnership Agreement expressly provided that limited partners had no right to withdraw or reduce their Special Contributions to the Partnership once made, and the general partners were not liable to the limited partners for any loss or liability unless attributable to the willful misconduct or gross negligence of a general partner. Since there was no primary obligor against whom petitioner had a remedy to recover amounts paid by him to NBNA pursuant to the Limited Partner Guarantee or to the Partnership as a Special Contribution, we conclude that petitioner was not a mere guarantor of his pro rata portion of the Partnership's recourse indebtedness but was ultimately liable for it. See Gefen v. Commissioner, supra at 1501; Abramson v. Commissioner,86 T.C. 360, 366 n. 10 (1986); Smith v. Commissioner,84 T.C. 889, 908 (1985). Petitioner was therefore at risk within the meaning of section 465 for the full amount of his pro rata share *566 of the Partnership's recourse indebtedness to NBNA. [17] See Gefen v. Commissioner, supra at 1503; Abramson v. Commissioner, supra at 375-376. *567 Respondent's second argument is that petitioner was effectively protected against any risk of loss in this transaction, and that, under section 465(b)(4), he is therefore not at risk for his share of the Partnership's recourse debt. This argument is based on respondent's reading of section 1.465-1(b), Proposed Income Tax Regs., 44 Fed. Reg. 32238 (June 5, 1979), which provides that in applying section 465, substance prevails over form, and a taxpayer's amount at risk will not be increased if the transaction is inconsistent with normal commercial practices or is, in essence, a device to avoid section 465. Respondent also cites section 1.465-6(c), Proposed Income Tax Regs., 44 Fed. Reg. 32237 (June 5, 1979), which provides that if the taxpayer is liable for repayment of an amount borrowed only upon the occurrence of a contingency, the taxpayer is not considered at risk with respect to such amount if the likelihood of the contingency occurring is such that the taxpayer is effectively protected against loss. [18]
*568 Appying these principles, respondent argues that under normal commercial practices, NBNA should have been more concerned with obtaining limited partner guarantees in the latter part of the lease term, when a default would be more likely, rather than to have the guarantees expire on January 1, 1983; further, the guarantees were not an economic element of the transaction and were used only as a device to avoid section 465. Lastly, only in the most extreme circumstances could petitioner be required to pay his full pro rata share of the Partnership's recourse liability, since the bank can only proceed against him if the Partnership's assets were insufficient, and then can only recover an amount equal to the excess of the unpaid loan over the proceeds from the sale of the collateral. Respondent concludes that there is very little real possibility that petitioner would be required to make good on his Guarantee, that he is effectively protected against loss despite "a modicum of legal liability," and that he is therefore not at risk for more than his actual cash contributions to the Partnership. We disagree with respondent that the transaction here was inconsistent with normal commercial *569 practices. Although no evidence was introduced by either party on this point, we note again that NBNA was a third party institutional lender who negotiated this loan with Alanthus in good faith and in arm's-length negotiations. We see no reason to doubt that the loan was structured in a way which was consistent with both normal commercial practices and NBNA's goal of protecting its own interests. In support of his argument that the Guarantee was just a device to avoid section 465, respondent points to the fact that the Guarantee was extended from 1983 to 1986 because of the enactment of section 465 into law. We find the relevant inquiry here to be the circumstances surrounding the Guarantee in 1978. In any event, the Guarantee, as extended, was valid and enforceable, and petitioner was in fact at risk due to the Guarantee during all the years it was in effect. We also find that petitioner's personal liability on the recourse indebtedness was not so contingent as to effectively protect him from risk. Petitioner was directly and ultimately liable for this amount, and his exposure was genuine. The contingencies upon which that liability would ripen were not so remote as to *570 render any risk of repayment negligible; in fact, as petitioner points out on brief, the rapid decline in the Computer System's market value after the introduction of the IBM 4300 in January, 1979, served to increase the likelihood of a default by the Partnership and a foreclosure sale that would not yield a sufficient amount, thus triggering the limited partners' personal liability. Most likely, it was only because Litton and IRI continued to respect their obligations under their respective leases that a default by the Partnership was avoided. Therefore, we cannot agree with respondent that petitioner was effectively protected against the risk of loss here. We conclude that he was properly at risk for his pro rata share of the Partnership's recourse liability. The last issue relates to the proper computation of depreciation by the Partnership for the year 1978, the first year of its existence. The Partnership computed its 1978 depreciation allowance for the Computer System pursuant to the Asset Depreciation Range (ADR) System and the "half-year convention" set forth in section 1.167(a)-11(c)(2), Income Tax Regs. Under the half-year convention, the Partnership was entitled *571 to claim depreciation attributable to one-half of the months in its taxable year. The issue here is when that first taxable year began. Petitioner argues that the Partnership's 1978 taxable year was a full 12-month year, and that the Partnership was therefore entitled to 6 months of depreciation on the Computer System in 1978. See section 1.167(a)-11(c)(2)(iv)(b), Income Tax Regs. Respondent asserts that the Partnership's 1978 taxable year did not start until November 30, 1978 and was therefore less than 2 months long. Section 7701(a)(23) defines the term "taxable year" as follows: The term "taxable year" means the calendar year, or the fiscal year ending during such calendar year, upon the basis of which the taxable income is computed under subtitle A. "Taxable year" means, in the case of a return made from a fractional part of a year under the provisions of subtitle A or under regulations prescribed by the Secretary, the period for which such return is made.
Similarly, section 441(b)(3) provides that for purposes of subtitle A, "taxable year" means the period for which a return is made, if a return is made for a period of less than 12 months. Section 443(a)(2) provides, *572 in part, that a return for a period of less than 12 months must be made if a taxpayer is "in existence" during only part of what would otherwise be his taxable year. Petitioner and respondent disagree on the question of when the Partnership "came into existence" and became obligated to file tax returns. Petitioner argues that the Partnership's date of its formation in January, 1978, is the relevant date, and that the Partnership was required to file a tax return for the period commencing on that date. Respondent's position is that the Partnership did not "come into existence" until it began actively conducting a trade or business by acquiring and placing in service the assets needed to conduct that trade or business. Respondent relies on section 1.167(a)-11(c)(2)(iv)(c), Income Tax Regs., a regulation which by its express terms applies only to property placed in service after November 14, 1979. That regulation provides as follows: For purposes of this paragraph, for property placed in service after November 14, 1979 other than depreciation property described in paragraph (c)(2)(iv)(e) of this section, the taxable year of the person placing such property in service does *573 not include any month before the month in which the person begins engaging in a trade or business or holding depreciable property for the production of income.
Respondent concedes that this case involves property placed in service before November 14, 1979, but argues that there is no reason for a different result to obtain. We find it unnecessary to decide whether this regulation is applicable. Rather, we will decide this issue on the basis of our recent holding in Torres v. Commissioner,88 T.C. 702 (1987). In that case, faced with a similar situation, we stated: There is a substantial body of law * * * which defines the characteristics that a venture must have in order to constitute a partnership for Federal tax purposes. We believe that the factors which determine whether a venture is a partnership for Federal tax purposes must inherently also define when a venture becomes a partnership for such purposes. * * *
Torres v. Commissioner, supra at 736. The existence of a partnership has been held to depend upon "whether, considering all the facts * * * the parties in good faith and acting with a business purpose intended to join *574 together in the present conduct of the enterprise." Commissioner v. Culbertson,337 U.S. 733, 742 (1949) (Fn. ref. omitted). See also Commissioner v. Tower,327 U.S. 280 (1946); Peters v. Commissioner, 899 T.C.    (Sept. 9, 1987); Sparks v. Commissioner,87 T.C. 1279 (1986); section 761(a). Therefore, for Federal tax purposes a partnership cannot exist unless the parties thereto have a good faith intent to presently conduct an enterprise with a business purpose. In Torres, we concluded that the partnership in that case did not have a good faith intent to presently conduct an enterprise with a business purpose prior to entering into the sale leaseback transaction at issue. We hold likewise in this case. The Partnership, while ostensibly formed in January 1978, clearly was not involved in conducting any enterprise prior to November 30, 1978. The limited partnership interests were not even offered until September 15, 1978, and the Partnership was only minimally capitalized prior to the subscription of the limited partners. The purpose and only activity of the Partnership was to purchase the Computer System from *575 and lease it back to IRI, and this did not take place until November 30, 1978. It is clear that the parties involved in the Partnership did not intend to presently conduct any enterprise through the Partnership until the sale leaseback transaction was consummated. As such, in accordance with the definition of a partnership for Federal tax purposes, the Partnership did not come into existence prior to engaging in that transaction. Accordingly, the Partnership had a short 1978 taxable year which commenced on November 31, 1978. Sections 441(b)(3), 443(a)(2). Pursuant to section 1.167(a)-11(c)(2)(iv)(b), Income Tax Regs., the Partnership was not entitled to depreciation in 1978 based on applying the half-year convention to a 12-month taxable year, but rather must apply such convention to the short taxable year commencing on November 30, 1978. While respondent challenged the effectiveness of the Partnership's election of the half-year convention for its 1978 year, he does not question that the Partnership complied with the formalities of making the election, as specified in section 1.167(a)-11(f), Income Tax Regs. Accordingly, we hold that the Partnership validly elected the use *576 of the half-year convention for its tax year ending December 31, 1978, and that such year began on November 30, 1978. Because we have held that petitioner's investment in the Partnership had economic substance, we need not consider respondent's assertion that petitioner's underpayments of tax were attributable to a tax-motivated transaction within the meaning of section 6621(c). To reflect the foregoing, Decision will be entered under Rule 155.
Appendix A PENGUIN ASSOCIATES SCHEDULE A REMAINING LIMITED PARTNERS' CONTRIBUTION $ 643,711
PROJECTIONS OF TAXABLE EVENTS ARE MADE FOR INFORMATIONAL PURPOSES ONLY, AND THEY HAVE NOT BEEN PASSED UPON BY COUNSEL. THE PROJECTIONS DO NOT TAKE INTO ACCOUNT THE EFFECT, IF ANY, OF THE MAXIMUM TAX, THE MINIMUM TAX AND THE INVESTMENT INTEREST LIMITATION ON THE PARTICULAR CIRCUMSTANCES OF INDIVIDUAL INVESTORS. THEY ARE BASED UPON THE ASSUMPTIONS AND ARE SUBJECT TO THE RISKS DESCRIBED IN THE ACCOMPANYING MEMORANDUM, AND MUST BE VIEWED IN LIGHT OF SUCH ASSUMPTIONS AND RISKS. (SEE PARTICULARLY THE DISCUSSIONS UNDER "FEDERAL TAX CONSEQUENCES".) NO REPRESENTATIONS OR WARRANTIES ARE BEING MADE AS TO TAX EFFECT, DEPRECIABLE LIVES, METHODS *577 AND ALLOCATIONS, OR LEGAL EFFECT OF THE TRANSACTION.
SEE PAGES 47 AND 48 OF THE ATTACHED CONFIDENTIAL MEMORANDUM FOR THE UNDERLYING ASSUMPTIONS AND RISKS RELATING TO DEPRECIATION SHOWN BELOW. (1)
(2)
(3)
(4)
(5)
(A)
(B)
(C)
RENTAL
DEBT
INTEREST
PRINCIPAL
DEPRECIATION &
YEAR
INCOME
SERVICE
EXPENSE
REPAYMENT
AMORTIZATION
1978
69,396
70,425
31,272
39,153
469,124
1979
832,752
845,094
351,702
493,392
968,488
1980
832,752
845,094
305,417
539,677
968,488
1981
832,752
845,094
254,792
590,302
968,488
1982
769,131
760,266
200,377
559,889
968,488
1983
578,268
590,610
157,661
432,949
502,388
1984
578,268
590,610
117,047
473,563
36,288
1985
578,268
590,610
72,624
517,986
36,288
1986 **
433,701
394,870
22,823
372,047
27,216
5,505,288
5,532,673
1,513,715
4,018,958
4,945,256
(6)
(7)
(8)
(D)
TAXABLE
NET
INCOME
CASH
YEAR
EXPENSES
(LOSS)
FLOW *
1978
20,000
(451,000)
-0-
1979
500
(487,938)
700
1980
500
(441,653)
700
1981
500
(391,028)
700
1982
500
(400,234)
700
1983
500 ** ( 82,281)
700
1984
500 ** 424,433 700
1985
500
468,856 700
1986 **
500
383,162 400
24,000
(977,683)
5,300
*578 THE AMOUNTS IN COLUMNS (1) - (8) INCLUDE THE GENERAL PARTNERS' 1.1% ALLOCATION AND THE INITIAL LIMITED PARTNERS' .05% ALLOCATION FOR WHICH RESPECTIVE CAPITAL CONTRIBUTIONS OF $ 7,163 AND $ 326 WILL BE MADE.
September 15, 1978
It is assumed that the Original Equipment and Additional Equipment will be acquired by the Partnership on November 30, 1978 and that the Partnership will assume the related long term debt on December 1, 1978.
Notes
a Original Equipment: Under the Lease, rentals will be payable at the rate of $ 64,980 (1.502% of Original Equipment *579 cost) per month in advance for the first 45 months and $ 43,773 (1.012% of Original Equipment cost) per month in advance for the remaining period.
Additional Equipment: Under the Lease, rentals will be payable at the rate of $ 4,416 (1.314% of the Additional Equipment cost) per month in advance for 94 months.
b Original Equipment: The long term debt bears interest at 9% per year. Long term debt service payments by the Partnership will be payable monthly in arrears in 45 equal payments of $ 64,880 and thereafter 48 equal payments of $ 43,673. The first such debt service payment is due on January 1, 1979. The Partnership will issue to IRI the Purchase Money Note in the principal amount of $ 208,200, which will bear interest at 6% per year, which interest will accrue but not be paid during the term of the Lease.
Additional Equipment: The long term debt bears interest at 9% per year. Long term debt service payments by the Partnership will be payable monthly in arrears in 93 equal payments of $ 4,416. The first such debt service payment is due on January 1, 1979. The Partnership will issue to IRI the Purchase Money Note in the principal amount of $ 17,500, which will bear interest *580 at 6% per year, which interest will accrue but not be paid during the term of the Lease.
Depreciable Items: IBM "303X" series computer systems consisting of (i) Original
$ 4,325,000
Equipment (5 years; SL)
(ii) Additional Equipment (5 years; SL)
336,000
(iii) Lease Brokerage Fee - Original Equipment (94 months; SL)
252,223
(iv) Lease Brokerage Fee - Additional Equipment (94 months; SL)
32,031
Depreciation charges have been computed using the half year
convention for 1978; see pages 47 and 48 of the attached
confidential memorandum for the assumptions and risks relating to depreciation.
d In 1978, $ 20,000 will be paid to tax counsel for tax advice to the Partnership. SUMMARY OF PARTNERSHIP CASH UTILIZATION
SOURCE OF FUNDS
Long Term Debt-Original Equipment
$ 3,724,043
Long Term Debt-Additional Equipment
294,915
Capital Contributions to the Partnership
From Individual General Partner (1%)
6,512
From Corporate General Partner (.1%)
651
From Remaining Limited Partners (98.85%)
643,711
From Initial Limited Partner (.05%)
326
Advance Rent-Original Equipment
64,980
Advance Rent-Additional Equipment
4,416
Subordinated Note-Original Equipment
208,200
Subordinated Note-Additional Equipment
17,500
TOTAL CASH AVAILABLE
$ 4,965,254
*581 USE OF FUNDS
Purchase Price of Original Equipment
$ 4,325,000
Purchase Price of Additional Equipment
336,000
Lease Brokerage Fee-Original Equipment
252,223
Lease Brokerage Fee-Additional Equipment
32,031
Tax Advice
20,000
TOTAL USE OF FUNDS
$ 4,965,254
Projections of taxable events are made for informational purposes only, and they have not been passed upon by counsel. The projections do not take into account the effect, if any, of the maximum tax, the minimum tax and the investment interest limitation of the particular circumstances of individual investors. They are based upon the assumptions and are subject to the risks described in the accompanying memorandum, and must be viewed in light of such assumptions and risks. (See particularly the discussions under "Federal Tax Consequences".) No representations or warranties are being made as to tax effect, depreciable lives, methods and allocations, or legal effect of the transaction.
PENGUINE ASSOCIATES SCHEDULE B LIMITED PARTNER'S CONTRIBUTION $ 64,371
PROJECTIONS OF TAXABLE EVENTS ARE MADE FOR INFORMATIONAL PURPOSES ONLY, AND THEY HAVE NOT BEEN PASSED UPON BY COUNSEL. THE PROJECTIONS DO NOT *582 TAKE INTO ACCOUNT THE EFFECT, IF ANY, OF THE MAXIMUM TAX, THE MINIMUM TAX AND THE INVESTMENT INTEREST LIMITATION ON THE PARTICULAR CIRCUMSTANCES OF INDIVIDUAL INVESTORS. THEY ARE BASED UPON THE ASSUMPTIONS AND ARE SUBJECT TO THE RISKS DESCRIBED IN THE ACCOMPANYING MEMORANDUM, AND MUST BE VIEWED IN LIGHT OF SUCH ASSUMPTIONS AND RISKS (SEE PARTICULARLY THE DISCUSSIONS UNDER 'FEDERAL TAX CONSEQUENCES'.) NO REPRESENTATIONS OR WARRANTIES ARE BEING MADE AS TO TAX EFFECT, DEPRECIABLE LIVES, METHODS AND ALLOCATIONS, OR LEGAL EFFECT OF THE TRANSACTION.
SEE PAGES 47 AND 48 OF THE ATTACHED CONFIDENTIAL MEMORANDUM FOR THE UNDERLYING ASSUMPTIONS AND RISKS RELATING TO DEPRECIATION SHOWN BELOW. (1)
(2)
(3)
(4)
(5)
(A)
(B)
(C)
ANNUAL
ANNUAL
TAXABLE
PURCHASE
CASH
PROFIT
ANNUAL CASH
YEAR
INSTALLMENT
INTEREST
OUTLAY
(LOSS)
DISTRIBUTION
1978
12,871
12,871
(44,581)
-0-
1979
18,500
2,554
21,054
(50,787)
70
1980
17,000
2,805
19,805 (46,462)
70
1981
16,000
1,360
17,360
(40,013)
70
1982
(39,563)
70
1983
*  -0-
70
1984
* 33,822 70
1985
46,346 70
RESIDUAL VALUE (G)
1986
(0%)
70,672 40
1986
(20% - $ 829,000;
Partnership
share = $ 497,221) ** 119,822 49,190
1986
(30% - $ 1,243,500;
Partnership
share = $ 911,721) ** 160,796 90,164
1986
(40% - $ 1,658,000;
Partnership
share = $ 1,326,221) ** 201,769 131,137
*583 (1)
(2)
(6)
(7)
(8)
(D)
(E)
(F)
AFTER TAX CASH BENEFIT
70% BRACKET
PURCHASE
ANNUAL
NET
NET
YEAR
INSTALLMENT
INTEREST
BENEFIT
BENEFIT
CUMULATIVE
1978
12,871
31,207 18,336 18,336 1979
18,500
2,554
35,621 14,567 32,903 1980
17,000
2,805
32,593 12,788 45,691 1981
16,000
1,360
28,079 10,719 56,410 1982
27,764 27,764 84,174 1983
70 70 84,244 1984
(23,605)
(23,605)
60,639 1985
(32,372)
(32,372)
28,266 RESIDUAL VALUE (G)
1986
(0%)
(49,430)
(49,430)
(21,164)
1986
(20% - $ 829,000;
Partnership
share = $ 497,221)
(34,685)
(34,685)
( 6,419)
1986
(30% - $ 1,243,500;
Partnership
share = $ 911,721)
(22,393)
(22,393)
5,873 1986
(40% - $ 1,658,000;
Partnership
share = $ 1,326,221)
(10,101)
(10,101)
18,165 (1)
(2)
(9)
(10)
(11)
(D)
(E)
(F)
AFTER TAX CASH BENEFIT
60% BRACKET
PURCHASE
ANNUAL
NET
NET
YEAR
INSTALLMENT
INTEREST
BENEFIT
BENEFIT
CUMULATIVE
YEAR
1978
12,871
26,749 13,878 13,878 1978
1979
18,500
2,554
30,542 9,488 23,366 1979
1980
17,000
2,805
27,947 8,142 31,508 1980
1981
16,000
1,360
24,008 6,648 38,156 1981
1982
23,808 23,808 61,964 1982
1983
70 70 62,034 1983
1984
(20,223)
(20,223)
41,811 1984
1985
(27,738)
(27,738)
14,073 1985
RESIDUAL VALUE (G)
1986
(0%)
(42,363)
(42,363)
(28,290)
1986
(20% - $ 829,000;
Partnership
share = $ 497,221)
(22,703)
(22,703)
( 8,630)
1986
(30% - $ 1,243,500;
Partnership
share = $ 911,721)
( 6,314)
( 6,314)
7,759 1986
(40% - $ 1,658,000;
Partnership
share = $ 1,326,221)
10,076 10,076 24,149 *584 SEPTEMBER 15, 1978
NOTES
(A) THE 1978 INSTALLMENT IN COLUMN (1) IS PAYABLE IN CASH UPON SUBSCRIPTION TO A UNIT OF THE PARTNERSHIP. THE REMAINING INSTALLMENTS REPRESENT PAYMENTS IN SATISFACTION OF LIMITED PARTNERS' NOTES SECURED BY LETTER OF CREDIT. COLUMN (2) IS CALCULATED AT 8-1/2% PER ANNUM ON THE UNPAID COLUMN (3) EQUALS THE SUM OF LIMITED PARTNERS' INSTALLMENT PAYMENTS (COLUMN 1) AND INTEREST THEREON (COLUMN 2).
(B) COLUMN (4) EQUALS THE SUM OF A ONE UNIT LIMITED PARTNER'S 9.885% SHARE OF "TAXABLE PROFIT (LOSS)" (SCHEDULE A, COLUMN 7) OF THE PARTNERSHIP AND INTEREST (COLUMN 2 HEREIN).
(C) COLUMN (5) REPRESENTS ANNUAL NET CASH FLOW FROM OPERATIONS AVAILABLE FOR DISTRIBUTION APPLICABLE TO A ONE UNIT SHARE.
(D) COLUMN (6) EQUALS THE SUM OF 70% OF "ANNUAL TAXABLE PROFIT (LOSS)" (COLUMN 4) AND "ANNUAL CASH DISTRIBUTION" (COLUMN 5).
(E) COLUMNS (7) AND (10) EQUAL "ANNUAL BENEFIT" ( COLUMN 6 OR 9) LESS "ANNUAL CASH OUTLAY" (COLUMN *585 3).
(F) COLUMNS (8) AND (11) ARE THE CUMULATIVE SUMS OF COLUMNS (7) OR (10) RESPECTIVELY.
(G) THE ALTERNATIVE RESIDUAL VALUE FIGURES FOR 1986 ASSUME THE SALE OF ALL OF THE EQUIPMENT FOR DIFFERENT PERCENTAGES OF THE LIST PRICE OF THE EQUIPMENT AT THE TIME OF ITS ACQUISITION BY INTEGRATED ($ 3,825,000 WITH RESPECT TO THE ORIGINAL EQUIPMENT AND $ 320,000 WITH RESPECT TO THE ADDITIONAL EQUIPMENT). AFTER PAYMENT TO IRI OF THE $ 331,779 (INCLUSIVE OF ACCRUED INTEREST) OUTSTANDING BALANCE OF THE PURCHASE MONEY NOTES, THE PARTNERSHIP WILL RECEIVE 100% OF THE NET RESIDUAL PROCEEDS.
PENGUINE ASSOCIATES SCHEDULE B LIMITED PARTNER'S CONTRIBUTION $ 64,371
PROJECTIONS OF TAXABLE EVENTS ARE MADE FOR INFORMATIONAL PURPOSES ONLY, AND THEY HAVE NOT BEEN PASSED UPON BY COUNSEL. THE PROJECTIONS DO NOT TAKE INTO ACCOUNT THE EFFECT, IF ANY, OF THE MAXIMUM TAX, THE MINIMUM TAX AND THE INVESTMENT INTEREST LIMITATION ON THE PARTICULAR CIRCUMSTANCES OF INDIVIDUAL INVESTORS. THEY ARE BASED UPON THE ASSUMPTIONS AND RISKS (SEE PARTICULARLY THE DISCUSSIONS UNDER 'FEDERAL TAX CONSEQUENCES'). NO REPRESENTATIONS OR WARRANTIES ARE BEING MADE AS TO TAX EFFECT, DEPRECIABLE LIVES, METHODS AND ALLOCATIONS, *586 OR LEGAL EFFECT OF THE TRANSACTION.
SEE PAGES 47 AND 48 OF THE ATTACHED CONFIDENTIAL MEMORANDUM FOR THE UNDERLYING ASSUMPTIONS AND RISKS RELATING TO DEPRECIATION SHOWN BELOW. (1)
(2)
(3)
(4)
(5)
(A)
(B)
(C)
ANNUAL
ANNUAL
TAXABLE
PURCHASE
CASH
PROFIT
ANNUAL CASH
YEAR
INSTALLMENT
INTEREST
OUTLAY
(LOSS)
DISTRIBUTION
1978
12,871
12,871
(44,581)
-0-
1979
18,500
2,554
21,054
(50,787)
70
1980
17,000
2,805
19,805
(46,462)
70
1981
16,000
1,360
17,360
(40,013)
70
1982
(39,563)
70
1983
* -0-   70
1984
* 33,822 70
1985
46,346 70
RESIDUAL VALUE (G)
1986
(0%)
70,672 40
1986
(20% - $ 829,000;
Partnership
share = $ 497,221) ** 119,822 49,190
1986
(30% - $ 1,243,500;
Partnership
share = $ 911,721) 160,796 90,164
1986
(40% - $ 1,658,000;
Partnership
share = $ 1,326,221) 201,769  131,137
(1)
(2)
(6)
(7)
(8)
(D)
(E)
(F)
AFTER TAX CASH BENEFIT
55% BRACKET
PURCHASE
ANNUAL
NET
NET
YEAR
INSTALLMENT
INTEREST
BENEFIT
BENEFIT
CUMULATIVE
YEAR
1978
12,871
24,520 11,649 11,649 1978
1979
18,500
2,554
28,003 6,949 18,598 1979
1980
17,000
2,805
25,624 5,819 24,417 1980
1981
16,000
1,360
22,077 4,717 29,134 1981
1982
21,830 21,830 50,964 1982
1983
70 70 51,034 1983
1984
(18,532)
(18,532)
32,502 1984
1985
(25,420)
(25,420)
7,082 1985
RESIDUAL VALUE (G)
1986
(0%)
(38,830)
(38,830)
(31,748)
1986
(20% - $ 829,000;
Partnership
share = $ 497,221)
(16,712)
(16,712)
( 9,630)
1986
(30% - $ 1,243,500;
Partnership
share = $ 911,721)
1,726 1,726 8,808 1986
(40% - $ 1,658,000;
Partnership
share = $ 1,326,221)
20,164 20,164 27,426 *587 SEPTEMBER 15, 1978
NOTES
(A) THE 1978 INSTALLMENT IN COLUMN (1) IS PAYABLE IN CASH UPON SUBSCRIPTION TO A UNIT OF THE PARTNERSHIP. THE REMAINING INSTALLMENTS REPRESENT PAYMENTS IN SATISFACTION OF LIMITED PARTNERS' NOTES SECURED BY LETTER OF CREDIT. COLUMN (2) IS CALCULATED AT 8-1/2% PER ANNUM ON THE UNPAID COLUMN (3) EQUALS THE SUM OF LIMITED PARTNERS' INSTALLMENT PAYMENTS (COLUMN 1) AND INTEREST THEREON (COLUMN 2).
(B) COLUMN (4) EQUALS THE SUM OF A ONE UNIT LIMITED PARTNER'S 9.885% SHARE OF "TAXABLE PROFIT (LOSS)" (SCHEDULE A, COLUMN 7) OF THE PARTNERSHIP AND INTEREST (COLUMN 2 HEREIN).
(C) COLUMN (5) REPRESENTS ANNUAL NET CASH FLOW FROM OPERATIONS AVAILABLE FOR DISTRIBUTION APPLICABLE TO A ONE UNIT SHARE.
(D) COLUMN (6) EQUALS THE SUM OF 70% OF "ANNUAL TAXABLE PROFIT (LOSS)" (COLUMN 4) AND "ANNUAL CASH DISTRIBUTION" (COLUMN 5).
(E) COLUMNS (7) AND (10) EQUAL "ANNUAL BENEFIT" ( COLUMN 6 OR 9) LESS "ANNUAL CASH OUTLAY" (COLUMN *588 3).
(F) COLUMNS (8) AND (11) ARE THE CUMULATIVE SUMS OF COLUMNS (7) OR (10) RESPECTIVELY.
(G) THE ALTERNATIVE RESIDUAL VALUE FIGURES FOR 1986 ASSUME THE SALE OF ALL OF THE EQUIPMENT FOR DIFFERENT PERCENTAGES OF THE LIST PRICE OF THE EQUIPMENT AT THE TIME OF ITS ACQUISITION BY INTEGRATED ($ 3,825,000 WITH RESPECT TO THE ORIGINAL EQUIPMENT AND $ 320,000 WITH RESPECT TO THE ADDITIONAL EQUIPMENT). AFTER PAYMENT TO IRI OF THE $ 331,779 (INCLUSIVE OF ACCRUED INTEREST) OUTSTANDING BALANCE OF THE PURCHASE MONEY NOTES, THE PARTNERSHIP WILL RECEIVE 100% OF THE NET RESIDUAL PROCEEDS. PENGUIN ASSOCIATES-DIAGRAM OF TRANSACTION [SEE ILLUSTRATION IN ORIGINAL] Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code, as in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Respondent has conceded that petitioners made an additional payment of tax in the amount of $ 1,349 for the year 1979, which was not reflected in the notice of deficiency. In addition, the parties have reached a basis of settlement as to an issue involving charitable contributions. The two last issues remaining, regarding income averaging and medical expenses, are strictly computational, and will be resolved following the Court's decision on the substantive issues. ↩
3. Integrated is a publicly owned corporation with shares traded on the New York Stock Exchange. Its primary lines of business are the structuring, marketing, and managing of investments for investors and the underwriting of insurance. ↩
4. Litton subsequently subleased the Computer System to Comdisco, Inc., on May 11, 1982. In 1984, Comdisco, Inc., subleased it to Minnesota Gas Company for the remainder of the lease term. ↩
5. The Upgrade, to provide for additional memory capacity, was ordered from IBM by Litton in June of 1978. ↩
6. See discussion infra.↩
7. In fact, however, this turned out not to be the case, and Alanthus eventually received less than $ 1.7 million on remarketing. As time progressed and more and more 3033's were available on the market, the demand for the 370/168 system diminished considerably. ↩
8. The lease rate charged by Alanthus was substantially lower than IBM's lease rates for the same Computer System: Under a four-year lease from IBM, Litton would have paid $ 84,000 per month, and longer leases were not available. However, the lease rate charged was still fair rental value, as evidenced by the fact that two competitors of Alanthus, who also negotiated with Litton for the 3033's Litton had ordered, came in with bids of monthly rental rates within $ 1.95 of Alanthus' rates. ↩
9. The principal amount of this note, together with accrued interest (a total of $ 318,555) was to be paid in two consecutive annual installments, on September 30, 1987 and September 30, 1988. The note was to be payable out of the residual value of the Computer System. ↩
10. The stipulation of facts stated that the rent was $ 64,980 for the first 45 months of the IRI Lease, and $ 43,773 for the remaining 49 months; however, petitioner reserved the right to demonstrate that the correct amounts of rent were as stated above. After examining petitioner's proof on this issue, we agree that the figures provided in the stipulation were erroneous. ↩
11. Petitioner received $ 2,485 of his contributions back in 1979 when the Partnership did not acquire the Upgrade to the Computer System. See discussion, supra.↩
12. The Partnership's projected break-even point, based on the Confidential Memorandum, is as follows: ↩
Total Partnership investment
$ 651,200 Less: Return of investment
(51,200)
on Upgrade
Net Partnership investment
600,000 Plus: Due to IRI
306,054 Remarketing fee (5%
47,408 of residual value)
Funds needed to break even
953,462 Less: Cash flow
(5,300)
Residual value
(948,162)
Profit (loss)
-0-   13. Blumenthal testified at trial that he would have predicted a residual value of 17 percent as of September 30, 1986, with the top of his "uncertainty range" at 22 percent. We are inclined to give little weight to this testimony, however, since his company's written report in 1978 seems far more indicative of their opinion at that time. ↩
14. See Gefen v. Commissioner,87 T.C. 1471, 1487 (1986); Estate of Thomas v. Commissioner,84 T.C. 412, 428↩ (1985). 15. The testimony and expert witness report of Jeffrey W. Traenkle was also offered by respondent on the issue of the economic viability of this transaction. Traenkle, a financial analyst at Arthur D. Little, Inc., testified that the partnership's investment was not economically viable, and that, in the absence of tax benefits, no economically rational person would enter into this transaction. Traenkle's conclusions were based on a discounted cash flow analysis. We agreed to receive his testimony over petitioner's objection that this type of analysis was irrelevant, citing Estate of Thomas v. Commissioner,supra at 440 n. 52. However, after reviewing Traenkle's report and testimony we decline to give it much weight. Tranekle's analysis indicated that the pretax return to the partnership had to be negative "at any meaningful interest rate, under the most conservative calculations"; on cross-examination, however, many of his figures were shown to be incorrect. Petitioner demonstrated that if the figures were correct, and if some of Traenkle's assumptions were changed, his analysis would show positive pretax returns at low interest rates. We were, therefore, not convinced of the accuracy of Traenkle's conclusions. Moreover, while this Court has relied on a discounted cash flow valuation analysis in cases (see, e.g., Goldstein v. Commissioner, 89 T.C.    (Sept. 14, 1987)), we prefer in this case to rely on our evaluation of the factors discussed above. We follow the reasoning expressed in Estate of Thomas v. Commissioner,supra, in which we stated: An issue * * * alluded to be some of the witnesses, is whether, in determining the economic viability of the instant transaction, we are required to discount the expected residual value of the equipment back to 1975 dollars. In the absence of statutory mandate, we decline to do so. While we are aware of our footnote 23 in Hilton v. Commissioner,74 T.C. 305, 353 n. 23 (1980) affd. per curiam 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 902 (1982), we note that the method employed therein was dictum in the context of circumstances bordering on the egregious. Moreoverr, we do not feel competent, in the absence of legislative guidance, to require that a particular return must be expected before a "profit" is recognized, the necessary conclusions to be drawn if we were discount residual value. As stated in sec. 1.183-2(b)(9), Income Tax Regs., in a closely related context, "the availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit." Our sole task here is to determine whether a profit was reasonably likely on these facts in order to find that tax avoidance was not the sole motivation for the transaction. Since the potential profit here was more than de minimis, we are satisfied that petitioners should prevail. See Lemmen v. Commissioner,77 T.C. 1326, 1342-1347 and nn. 22 and 24 (1981).
Estate of Thomas v. Commissioner,supra↩ at 440 n. 52. 16. As of 1984, this income was already being reported by petitioner. ↩
17. "A limited partner who assumes personal liability on a loan to the partnership (made by a bank or other lender), but who obtains the general partner's agreement to indemnify him against some or all of any loss arising under such personal liability, is at risk only with respect to the excess of the amount of the indebtedness over the maximum amount covered by the indemnity agreement." S. Rept. No. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 87 n. 5. A limited partner such as petitioner, who assumed personal liability on a loan to the Partnership, which was made by a bank or other lender, and who had no agreement with anyone to indemnify him against any loss arising with respect to such liability, was therefore at risk for the full amount of the indebtedness. Gefen v. Commissioner,87 T.C. 1471, 1503↩ (1986). Not only did petitioner not have an agreement with the general partners to indemnify him against loss arising under the Limited Partner Guarantee, but the Limited Partnership Agreement expressly provided that the general partners were not liable to the limited partners for any loss or liability incurred in connection with any matter, except for losses or liabilities attributable to the willful misconduct or gross negligence of a general partner. 18. We have previously held that when Congress originally enacted sec. 465 in 1976, the legislative intent was that a taxpayer is not to be considered at risk for any amount borrowed if he is protected against economic loss. Brand v. Commissioner,81 T.C. 821, 828 (1983), citing S. Rep. No. 94-938, 1976-3 C.B. (Vol. 3) 85. Sec. 465(b)(4) reflects the Congressional intent, as does sec. 1.465-6(c), Proposed Income Tax Regs.↩
*. THE "NET CASH FLOW" REFLECTS ESTIMATED ADMINISTRATIVE EXPENSES OF THE PARTNERSHIP OF $ 500 PER ANNUM. ** AN INDIVIDUAL MAY NOT DEDUCT HIS SHARE OF THE 1983 LOSS BECAUSE OF THE "AT RISK" LIMITATION. TO THE EXTENT NOT DEDUCTED, SUCH AMOUNT REDUCES THE TAXABLE INCOME OTHERWISE REPORTABLE IN 1984. SEE PAGE 46 OF THE ATTACHED CONFIDENTIAL MEMORANDUM AND SCHEDULE B. ** 1986 PROJECTIONS DO NOT TAKE INTO ACCOUNT THE EFFECT OF THE RESIDUAL VALUE OF THE EQUIPMENT UPON ITS RELEASE OR SALE AT THE EXPIRATION OF THE LEASE NOR THE OUTSTANDING PURCHASE MONEY NOTES AT THE END OF THE LEASE TERM IN THE AMOUNT OF $ 331,779.↩
*. SEE FOOTNOTE ** TO SCHEDULE A. ** REPRESENTS A ONE UNIT (9.885%) LIMITED PARTNER'S SHARE OF "TAXABLE PROFIT (LOSS)" OF THE PARTNERSHIP (SCHEDULE A, COLUMN 7), ADJUSTED FOR AN ASSUMED SALE OF ALL OF THE EQUIPMENT (SEE NOTE (G)).↩
*. SEE FOOTNOTE ** TO SCHEDULE A. ** REPRESENTS A ONE UNIT (9.885%) LIMITED PARTNER'S SHARE OF "TAXABLE PROFIT (LOSS)" OF THE PARTNERSHIP (SCHEDULE A, COLUMN 7), ADJUSTED FOR AN ASSUMED SALE OF ALL OF THE EQUIPMENT (SEE NOTE (G)).↩