MATTHEW J. STACOM AND ESTATE OF CLAIRE P. STACOM, DECEASED, MARK A. BERLIN, EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stacom v. Commissioner
Docket No. 28610-88
United States Tax Court
T.C. Memo 1991-231; 1991 Tax Ct. Memo LEXIS 260; 61 T.C.M. (CCH) 2691; T.C.M. (RIA) 91231; May 23, 1991, Filed *260 Decision will be entered under Rule 155. Bernard S. Mark, Richard S. Kestenbaum, and Mark A. Berlin, for the petitioners. Michael D. Wilder, Roland Barral, Mark L. Hulse, and Paulette Segal, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION Petitioners took deductions with respect to purchases and leasebacks of computer equipment. The deductions were disallowed on grounds that they were structured as a tax-avoidance scheme devoid of economic substance which should be disregarded for Federal income tax purposes. Respondent determined deficiencies in petitioners' Federal income tax for 1978, 1979, 1980, and 1981 in the amounts of $ 249,546, $ 1,187,321, $ 692,943, and $ 787,242, respectively. The statutory notice of deficiency determined increased interest attributable to tax-motivated transactions under section 6621(c) for 1978, 1979, 1980, and 1981. The issues for decision are: (1) Whether the sales and leasebacks of computer equipment had sufficient economic substance and business purpose. We hold that they did not. (2) Whether petitioners acquired the benefits and burdens of ownership in the equipment. *261 We need not reach this issue and the remaining issues, other than the increased interest, based on our holding above. (3) Whether petitioners had an actual and honest profit objective. (4) Whether section 465(a) [1] limits petitioners' ability to deduct losses from the sale and leaseback transaction because they were not at risk in excess of their cash investments. a. Whether petitioners were protected against loss. b. Whether petitioners' equipment installment notes ran in favor of parties with interests in the computer-leasing activities other than as creditors. (5) Whether petitioners are liable for increased interest under section 6621(c) for underpayments attributable to tax-motivated transactions. We hold that they are. References to petitioner in the singular are to petitioner Matthew *262 Stacom. References to petitioners are to Matthew Stacom and the Estate of Claire Stacom. References to the Stacoms are to Matthew and Claire Stacom. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Our use of terms such as payment, purchase, sell, own, note, lease, loss, gain, and transaction to describe the events is not necessarily to be construed as a finding that the transactions had economic substance. 1. Petitioners
Petitioners Matthew Stacom and the Estate of Claire Stacom resided in Palm Beach, Florida, when the petition was filed. Petitioner received a bachelor of arts degree from Lehigh University in 1941 and a master of arts degree from New York University in 1948. From 1946 until trial, he was employed by Cushman and Wakefield, Inc., the largest commercial real estate brokerage firm in the United States. Since about 1974, he has been the vice chairman and on the executive committee and board of directors of Cushman and Wakefield, Inc.
Petitioner was paid on a commission basis as a Cushman and Wakefield, Inc. broker. Petitioner's average working day was very long. His income was primarily derived from transactions originating *263 in the New York metropolitan area. Nevertheless, he traveled throughout the country with respect to major real estate transactions, including regular travel to Cleveland, St. Louis, and Chicago. During the early 1970's, petitioner sold to Sears the land upon which Sears constructed the tallest building in the world, the Sears Tower. Cushman and Wakefield, Inc., supervised the construction of the building in Chicago and managed it for 10 years. Petitioner became a stockholder in Cushman and Wakefield, Inc., in the mid-1950's and remained a stockholder until 1970, when RCA acquired the firm and purchased his stock for $ 2,000,000. Cushman and Wakefield, Inc., had a policy which prohibited its brokers from individually investing in real estate. Petitioner met his wife, Claire, in 1954. At that time, Claire Stacom had extensive business experience and was earning even more than petitioner, which was a substantial amount. During the time petitioner knew her, Claire Stacom was a very successful businessperson. Petitioner and his wife were partners in their family finances during their marriage. However, Claire Stacom played a larger role in the family finances. Using a family *264 account, she made the deposits and paid the family's bills. All of petitioner's income went into the family account. However, Claire Stacom wrote nearly every check. Petitioner wrote almost no checks. Claire Stacom, more than petitioner, dealt with financial professionals representing the family. Claire Stacom was a very competent negotiator. Petitioner believed that Claire Stacom had the competence to make the family financial decisions, and he relied upon her business acumen, experience, and expertise. The Stacoms used a portion of the RCA proceeds to purchase a large home in Greenwich, Connecticut. A substantial portion of the balance of the sales proceeds was deposited with the Irving Trust Company for investment on a very conservative, income-earning basis. The Stacoms invested some of the remainder of the funds in more speculative ventures. 2. Mark A. Berlin
Mr. Berlin is an attorney and certified public accountant in active practice since 1969. He has a bachelor of science degree in economics from New York University, a juris doctor degree from Brooklyn Law School, and a master of law in taxation from the New York University School of Law. His areas of specialty *265 include taxation and corporate law. As an attorney specializing in taxation, Mr. Berlin reviewed and sometimes wrote offering memoranda and tax opinions in connection with high-risk investments. The Stacoms met Mr. Berlin in the mid-1970's while they were adversaries during a coal mining investment negotiation. After the coal transaction closed, the Stacoms asked Mr. Berlin to be their family accountant and attorney. Initially, as their accountant, Mr. Berlin prepared the Stacom family member tax returns. However, he later became intimately involved with the Stacom family finances. Mr. Berlin's law firm represented the Stacom family in all matters, including litigation and estate planning. Mr. Berlin became very close to the Stacoms and their children. He became involved in the Stacom family's day-to-day operations and business dealings, dealing principally with Claire Stacom. He was appointed executor of Mrs. Stacom's estate and was selected as guardian of their minor children. After Claire Stacom's death, Mr. Berlin's contact with the Stacom family increased. He became a confidant to the Stacom children and undertook Claire Stacom's role of paying the family's bills, *266 making the deposits, maintaining the books and records, and investing the family's money. 3. Introduction to Computer Investment
Mark A. Berlin advised petitioner and Claire Stacom on some of the investment ventures. During the 1970's the Stacoms invested in oil and gas transactions and coal mining ventures. Petitioner also personally invested some of his money. However, petitioner relied primarily upon Claire Stacom for family financial decisions. During the years at issue, the Stacoms reported substantial income. In 1978 they reported a $ 747,338 gain from the sale of RCA stock. For 1979 through 1981, they reported combined salaries of $ 1,915,725, $ 951,433, and $ 1,263,427, respectively. They attempted to shelter part of that income from income taxes. To do so, they attempted to find a reputable and viable means of sheltering their income. Claire Stacom knew of Mr. Berlin's involvement with computer equipment. She also read about computer leasing. In July 1979, Claire Stacom asked Mr. Berlin about computer leasing. Claire Stacom reviewed lists of computer equipment with Mr. Berlin. She decided to invest in computer transactions. Initially, Claire Stacom received *267 all of the lease payments and made all the installment payments for the computer transactions. Tragically, Claire Stacom was killed in an automobile accident in 1983. 4. Salber Equipment Company
Beginning in the mid-1970's Mr. Berlin and Jeffrey Saltzer, a New York certified public accountant, formed Salber Equipment Company (Salber), a New York general partnership. Salber acted as investment consultants and brokers for computer equipment leasing companies, such as OPM Leasing Services, Inc. (OPM), Sha-Li Leasing Associates (Sha-Li), Funding Systems, Comdisco, and Finalco. The transactions involved primarily IBM mainframe computers. Salber's principal customers were high-net-worth individuals. Salber received commissions for arranging computer equipment sales. All computer sale and lease transactions in which Salber acted as a broker included an independent middle sales company. The middle sales company may have been partly for securities law purposes, but they were primarily an attempt to avoid at-risk problems of section 465. 5. The Sale and Leaseback Transactions
a. Background
In July 1979, Claire Stacom asked Mr. Berlin to locate computer equipment *268 as an investment for her family. Petitioner relied primarily upon Claire Stacom and Mr. Berlin for advice concerning this investment. Mr. Berlin asked Mr. Saltzer to provide a list of computer equipment that was available from various leasing companies. Both Mr. Berlin and Mr. Saltzer believed that it was more prudent to acquire older generation IBM equipment at a deep discount rather than to pay top of the market prices for new equipment. They selected the older IBM 370/158 (158) and 370/168 (168) (collectively the IBM 370 series) computer equipment. After considering and rejecting a substantial number of computers through various independent leasing companies, Mr. Berlin and Mr. Saltzer focused on OPM and Sha-Li. In his capacity as the Stacom's representative, Mr. Berlin was able to extract concessions from Mr. Saltzer and Salber, OPM, and Sha-Li. For example, Mr. Berlin was able to reduce petitioner's cash investment required for the transaction. He also arranged for the Stacoms to pay the initial installment in four payments and to pay a reduced commission to Salber. In deciding whether to recommend particular computer equipment to the Stacoms, Mr. Berlin considered the *269 credit rating for the end-user and the terms of the end-user lease. Mr. Berlin insisted that the rent under the initial end-user lease be sufficient to pay off the underlying debt to the bank that had a lien on the equipment to avoid the risk of foreclosure in the event of default. He also insisted that the lease require the end-user to pay a termination fee in an amount equal to or exceeding the loan due to the bank holding the underlying purchase lien if the end-user wanted to terminate the lease. Mr. Berlin also insisted that the computer have an IBM maintenance agreement to insure that the leased computer equipment be properly maintained. He also gave serious consideration to the tax benefits of the transaction. Mr. Saltzer checked with appraisers, including Harvey Berlent, for a fair market value appraisal and anticipated residual values appraisal for the OPM and Sha-Li equipment. Mr. Berlent was provided with the transaction prices before he made his appraisals. He was actually retained and paid by OPM and Sha-Li rather than the Stacoms. Mr. Berlent believed that after 9 years the equipment would have a value of approximately 20 percent of its cost to the Stacom family. *270 Before accepting the proposed OPM and Sha-Li transactions, Mr. Berlin and Claire Stacom reviewed a flowchart analysis prepared by Mr. Saltzer. They discussed the fair market value and anticipated residual value of the OPM and Sha-Li computer equipment that the Stacoms were considering. They also discussed anticipated secondary markets for the equipment to smaller companies and companies located overseas. The flowcharts reflected an economic worst case of no residual value. The flowcharts also demonstrated tax benefits of the transactions. The flowcharts showed that if the Stacoms obtained a 13-percent residual value based on the equipment cost, they would break even on the transaction. Mr. Berlin and Claire Stacom discussed the possibility of a cash profit based upon residual values indicated by the appraiser. Before closing the transactions, the Stacoms received written appraisals from Harvey Berlent confirming the oral appraisal he had given Mr. Saltzer. The appraisals reflect a fair market value and a residual value after 9 years of $ 2,100,000 and 20 percent for the Sha-Li equipment, and $ 2,900,000 and 20 percent for the OPM equipment, respectively. There were two separate *271 closings. Mr. Berlin and Claire Stacom again discussed the tax consequences of the transactions before the closings. At the closings, Mr. Berlin discussed tax consequences of the transactions with petitioner and Claire Stacom. Petitioner reviewed all the documents at the closings with Mr. Berlin, discussed the economics of the transactions, and signed all the papers, executed bank checks, and furnished letters of credit. b. OPM Transaction
(1) The Parties, OPM Leasing Services and Beta Delta Leasing, Inc. (Beta) OPM was a major lessor of IBM mainframe equipment. It was owned by Marion Goodman and Mordecai Wiseman. OPM was involved in a major fraud that was discovered in 1980. However, the fraud relates to different transactions than the one before us. OPM also filed for bankruptcy protection on March 11, 1981. Another leasing entity, Beta, was inserted into the transaction in part as an attempt to avoid at-risk problems under section 465. (2) OPM's Equipment and Leases to End-Users
OPM purchased one IBM 370/168, two IBM 370/158's and associated peripheral equipment and leased them to Univar, Saks, and Ideal Industries. The OPM purchase consisted of the following *272 IBM equipment: Model
Serial #
End User
3168
60312
Univar
3066
60598
Univar
3067
61582
Univar
2880
62570
Univar
370/158 U34
24407
Saks
3213
11300
Saks
370/158 U34
23184
Ideal
3213
10215
Ideal
(3) OPM Sale to Beta
On December 26, 1979, Beta purchased the same computer equipment from OPM (OPM equipment) for $ 2,890,000. The purchase price was $ 62,500 in cash and a $ 2,827,500 note. The note was payable as follows: December 26, 1979
$ 62,000 (prepaid
interest)
25 monthly payments
beginning December 31, 1979,
each in the amount of
$ 23,082.19
November 15, 1980
$ 170,000 plus 9 percent
interest per annum from
December 26, 1979
June 15, 1981
$ 110,000 plus 9 percent
interest per annum from
December 26, 1979
June 15, 1982
$ 20,500 plus 9 percent
interest per annum from
December 26, 1979
83 monthly payments
beginning January 31, 1982,
each in the amount of
$ 56,448.78
(4) Beta Sale to Stacoms
On the same day, December 26, 1979, the Stacoms purchased the OPM equipment from Beta for $ 2,900,000, subject to the OPM end-user leases. The purchase price was $ 72,500 in cash and a $ 2,827,500 note. The note payments from petitioner to Beta in their installment *273 note were on the same payment schedule as the note payments between OPM and Beta except that the 25 monthly payments beginning December 31, 1979, were each in the amount of $ 23,200 instead of the $ 23,082.19 due from Beta to OPM. Also, the 83 monthly payments beginning January 31, 1982, were each in the amount of $ 56,529.05 instead of the $ 56,448.78 due from Beta to OPM. The Stacom OPM Equipment Installment Note was backed by three recourse notes. The purchase agreement between Beta and petitioner closed before December 31, 1979. One of the reasons for closing in 1979 was so that petitioner and Claire Stacom could enjoy tax benefits from the deal in the 1979 taxable year. All of the OPM equipment was on line and subject to IBM maintenance. Salber's 3-percent commission for the transaction was paid by OPM. (5) Stacom's Leaseback to OPM
Under an agreement between petitioner and OPM, petitioner leased the equipment he purchased from Beta back to OPM on the same day, December 26, 1979. Under the terms of the lease, OPM leased the equipment for nine years until December 31, 1988, with 25 monthly fixed lease rent payments due beginning December 31, 1979, each in the amount *274 of $ 23,666.07, and 83 monthly payments beginning January 31, 1982, each in the amount of $ 56,995.12. The Stacoms did not know whether OPM had the unrestricted right to pledge the equipment. The Stacom OPM Equipment Purchase Agreement provides that "In connection with any New Loan, OPM shall not have the right, without the consent of the Buyer [Stacom] * * * to use the Equipment as collateral." Petitioner relied exclusively on Claire Stacom and Berlin with respect to the computer transactions. Whether a third party could use equipment purchased by petitioner as collateral for loans was not investigated by petitioner because if Mark Berlin was satisfied with the transaction, petitioner would sign the documents without investigating the contents. Before these computer transactions, petitioner had no dealings with OPM. He did not personally investigate OPM's business dealings or personally inspect the OPM equipment he purchased from Beta because he relied upon his wife and their attorney and financial adviser, Mark Berlin. He did not personally review the promissory note he signed. The Stacom OPM equipment installment note provided that petitioner was liable for principal and *275 interest due under "Anything in the Note or any other agreement, instrument or document executed in connection with or related to the transactions described herein to the contrary notwithstanding." However, the same note indicates that if OPM did not make lease payments to petitioner, he could defer the payments to Beta until February 28, 1996. It also indicates that if petitioner so chose, no interest would accrue on the deferred principal or interest. Moreover, the note indicates that if OPM did not make lease payments to petitioner, petitioner could reduce each of his payments of principal and interest as it became due to the extent any amount of rent was not received. After OPM stopped making payments to petitioner, he stopped making payments to Beta. On October 18, 1983, petitioner, Beta, and the Trustee in Bankruptcy for OPM agreed that OPM's Trustee would assume the OPM lease from the Stacoms. The agreement also provided the right of setoff in the event of a default. After OPM declared bankruptcy, it stopped making lease payments to petitioner. (6) OPM Marketing Agreement
Petitioner and OPM entered into a marketing agreement under which OPM was to market the equipment *276 for re-lease or sale after the OPM lease expired in 1988. In return for its services, OPM was entitled to be reimbursed for all costs and expenses of marketing, plus 10 percent of the net proceeds from the marketing. c. Sha-Li Transaction
The transaction involving the equipment initially owned by Sha-Li was very similar to the OPM transaction described above. (1) The Parties -- Sha-Li Leasing Associates and Proz Leasing Associates, Inc. Like OPM, Sha-Li Leasing Associates was a company that leased, sold, and financed IBM equipment to large companies. In 1981, it was located at 40 Wall Street, New York. George Prussin was Sha-Li's principal. He had been a salesman working in OPM's marketing department form 1978 until the end of 1979. Michael Zwick was the vice president of Sha-Li in December 1979. He was employed by OPM before working at Sha-Li. Ellen Slow was the senior vice president in charge of equity administration at Sha-Li. Sha-Li performed administrative functions for Proz Leasing Associates, Inc. (Proz), such as handling checks and bank accounts. Sha-Li maintained Proz's original records. Thus, if Proz wished to examine its own original records, it would *277 be necessary for Proz to visit Sha-Li's offices. In 1981 Proz was co-located with Sha-Li at 40 Wall Street, New York. The following year, they shared offices at 39 Broadway, New York. Like Beta, Proz was inserted into the transaction as an attempt to avoid at-risk problems under section 465. (2) The Sha-Li Equipment and Leases to End-Users
Sha-Li purchased IBM computer equipment. On July 12, 1979, Sha-Li leased three IBM 370/158's and associated peripheral equipment to Brown University, E.G. & G., and Scoa. The IBM equipment was as follows: Model
Serial #
End User
3158J
23855
E.G. & G.
3830
41219
E.G. & G.
3213
30280
E.G. & G.
3158-U31
23834
Brown
3158-U34
23182
Scoa
2313-1
10210
Scoa
(3) Sha-Li Sale to Proz
On December 21, 1979, Sha-Li sold the equipment to Proz for $ 2,098,000 payable in $ 30,500 in cash and a $ 2,067,500 note. The $ 2,067,500 note from Proz to Sha Li was payable as follows: December 21, 1979
$ 20,000 (prepaid
interest)
25 monthly payments
beginning December 31, 1979
each in the amount of
$ 16,912
June 15, 1980
$ 126,000 plus interest
from December 21, 1979 at
the rate of 9 percent per
annum
June 15, 1981
$ 84,000 plus interest
from December 21, 1979 at
the rate of 9 percent per
annum
June 15, 1982
$ 52,500 plus interest
from December 21, 1979 at
the rate of 9 percent per
annum
83 monthly payments
beginning January 31, 1982,
each in the amount of
$ 40,934.78
*278 (4) Proz Sale to the Stacoms
On the same day, December 21, 1979, Proz sold the equipment to petitioner for $ 2,100,000 payable in $ 32,500 in cash and a $ 2,067,500 note. The equipment was still subject to the end-user leases. Under the Stacom Sha-Li equipment installment note, petitioner was to make payments in precisely the same amounts and on the same dates as the note between petitioner and Proz. The Stacom Sha-Li equipment installment note was backed by three separate recourse notes. The purchase agreement provides language similar to the OPM agreement with regard to Sha-Li's right to pledge the Sha-Li equipment as collateral. As with the OPM transaction, petitioner relied exclusively on Claire Stacom and Mr. Berlin to investigate, analyze, and negotiate the Sha-Li transaction. Salber received 3 percent of $ 2.1 million as broker fees in the Sha-Li transaction. (5) Stacom Leaseback to Sha-Li
On the same day, December 21, 1979, petitioner leased the equipment to Sha-Li. The lease payment schedule from Sha-Li to petitioner mirrored the payments due from petitioner to Proz, under the note to Proz, and the payments due from Proz to Sha-Li under the note to Sha-Li. *279 The leaseback to Sha-Li had the following terms: 25 monthly payments
from December 31, 1979
$ 17,249.96
83 monthly payments
from January 31, 1982
$ 41,272.74
The Stacom Sha-Li equipment installment note included language similar to the Stacom OPM equipment installment note concerning petitioner's personal liability, deferred payments until February 28, 1996, and reduced principal and interest payment to the extent rent is not received. (6) Sha-Li Marketing Agreement
As with OPM, petitioner and Sha-Li entered into a marketing agreement under which Sha-Li was to market the equipment for release or sale after the Sha-Li lease expired in December 1988. In return for its services, Sha-Li was entitled to be reimbursed for all costs and expenses of marketing, plus 10 percent of the net proceeds received from the marketing. 6. Residual Valuations and The Experts
Several significant facts affected the residual valuations of the subject IBM 370/158 and 370/168 computer equipment. At the time at issue, each new line of IBM equipment had a lower price and greater performance than the prior line. Older IBM equipment used more space and energy than newer models. The *280 IBM 303X series was announced in March 1977. The IBM 303X series decreased the fair market value and residual value of the IBM 370/158 and 370/168 computers somewhat. However, some IBM 370 users felt the IBM 303X series was too expensive. It was sold with premiums for placing an order. In addition, it was the least popular computer series ever introduced by IBM. Memory for the IBM 370's became significantly cheaper around November 1979. More importantly, IBM announced their IBM 4300 series in January 1979, nearly a year before the subject transactions. The IBM 4300 series had three times the processing capability and one-third the cost of prior IBM equipment. The long-term effect of the IBM 4300 series was to significantly decrease the fair market values and residual values of the IBM 370/158 and 370/168 computers. a. S. Paul Blumenthal
Mr. Blumenthal testified as respondent's expert. He conducted his analysis in 1989. He believed that in December 1979 the fair market value of the OPM equipment was $ 2,224,932 and the Sha-Li equipment was $ 1,944,539. He then projected the residual value of the equipment as scrap as of December 1988. He believed that in December *281 1988 the residual value of the OPM equipment was $ 2,380 and the Sha-Li equipment was $ 1,895. Mr. Blumenthal did not consider the facts that the equipment was on lease, located, installed, and operating in particular locations with end-users and IBM maintenance agreements. However, he believed that keeping equipment on an IBM maintenance contract is a positive factor in determining residual value. Mr. Blumenthal made his fair market value and residual value analysis by relying on the Computer Price Guide or Bluebook and list prices for comparable equipment. The Computer Price Guide is a widely recognized authority on the value of used computer equipment. b. Harvey Berlent
Mr. Berlent made the only appraisal near the time of the transaction. He prepared a report on both the OPM and Sha-Li equipment. OPM and Sha-Li paid for these reports. Mr. Berlent's fair market valuation of the OPM and Sha-Li equipment was precisely the same as the purchase price of the equipment. He believed that as of December 1979, the fair market value was between $ 2,300,000 and $ 2,400,000 for the OPM equipment and $ 2,900,000 for the Sha-Li equipment. He projected the residual value of the *282 equipment in December 1988 to be 20 percent of the estimated fair market value of the equipment in December 1979. Mr. Berlent believed that the IBM series 303X and 4300 did not represent an improvement on the IBM 370 series machines, but were really clones of the IBM 370. c. Jerry Minsky
During the years at issue, Mr. Minsky was president of one of the five largest computer leasing companies in the United States. He bought, sold, and leased primarily IBM equipment including IBM 370/158's and 370/168's. He believed that computer equipment does not deteriorate because there is a user for every piece of computer equipment at some price. He also acknowledged the major price reductions for memory on most IBM 370 processors. However, he did not believe that the IBM 303X series had an increase in performance and a decrease in price from the IBM 370/158 and 370/168 computers. He did not believe that the IBM 303X series or 4300 series represented an increase in technology from the IBM 370/158 and 370/168 series. He felt that the IBM 4300 series had no impact on the value of IBM 370/158 and 370/168 computers. He did not mention the IBM 4300 series in his report. He based his *283 valuation in part on "gut feel." Mr. Minsky was somewhat selective in his reliance upon Computerworld articles. He relied on one report that indicates that the highest residual value that the International Data Corporation projected in February 1979 for January 1987 for IBM 370/158's and IBM 370/168/'s is 6 percent. Before he made his appraisal, he looked at a copy of the Berlent appraisal. Mr. Minsky's residual values were precisely the same as Mr. Berlent's.
d. Actual Residual Values
The OPM equipment was sold as scrap for $ 5,800 by a successor of OPM to Residual Materials, Inc. The Sha-Li equipment was also sold as scrap. OPINION 1. Economic Substance, Generally
A transaction is recognized for tax purposes only if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. 561, 583-584, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978); James v. Commissioner, 899 F.2d 905, 908 (10th Cir. 1990), affg. 87 T.C. 905 (1986). Taxpayers *284 are generally free to structure their business transactions as they please although motivated by tax reduction considerations. Gregory v. Helvering, 293 U.S. 465, 79 L. Ed. 596, 55 S. Ct. 266 (1935); Larsen v. Commissioner, 89 T.C. 1229, 1251 (1987), affd. on this issue, revd. and remanded on other grounds sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). The existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States, supra at 580-581; Levy v. Commissioner, 91 T.C. 838, 853 (1988); Larsen v. Commissioner, 89 T.C. at 1252; Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). However, it is well established that transactions lacking an appreciable effect, other than tax reduction, on a taxpayer's beneficial interest will not be recognized for tax purposes. See Knetsch v. United States, 364 U.S. 361, 366, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960). *285 More specifically, a transaction entered into solely for the purpose of tax reduction, and which is without economic, commercial, or legal purpose other than the expected tax benefits, is an economic sham without effect for Federal income tax purposes. Frank Lyon Co. v. United States, supra; Larsen v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 196; Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1243 (1981). Whether a transaction lacks economic substance or business purpose is a question of fact. Levy v. Commissioner, supra at 854; Larsen v. Commissioner, 89 T.C. at 1252; Torres v. Commissioner, 88 T.C. 702, 718-719 (1987); Mukerji v. Commissioner, 87 T.C. 926, 960 (1986); James v. Commissioner, 87 T.C. 905 (1986); affd. 899 F.2d 905 (10th Cir. 1990); Coleman v. Commissioner, 87 T.C. 178 (1986), affd. per curiam 833 F.2d 303 (3d Cir. 1987); Estate of Thomas v. Commissioner, supra; *286 Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 203; but see Swift Dodge v. Commissioner, 692 F.2d 651, 652 (9th Cir. 1982), revg. 76 T.C. 547 (1981) (citing Frank Lyon); American Realty Trust v. United States, 498 F.2d 1194, 1198-1199 (4th Cir. 1974) (cited with approval in Frank Lyon). 2. Economic Substance in a Sale and Leaseback Context
In Levy v. Commissioner, supra at 856, we held that in analyzing whether a transaction has economic substance, the following five factors are particularly significant: (1) The presence or absence of arm's-length price negotiations, Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986), affd. 860 F.2d 1075 (3d Cir. 1988); see also Karme v. Commissioner, 73 T.C. 1163, 1186 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); (2) the relationship between the sales price and fair market value, Zirker v. Commissioner, 87 T.C. 970, 976 (1986); Helba v. Commissioner, supra at 1005-1007, 1009-1011; (3) the structure of the financing, *287 Helba v. Commissioner, supra at 1007-1011; (4) the degree of adherence to contractual terms, Helba v. Commissioner, supra at 1011; and (5) the reasonableness of the income and residual value projections, Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 204-207. Considering these factors, we conclude that the subject transactions lacked economic substance. We are not persuaded that there were arm's-length price negotiations between OPM and Beta, or Sha-Li and Proz. Sha-Li and Proz appear to be the same entity. The relationship between OPM and Beta is less clear. Also, while he negotiated as the Stacoms' agent, Mr. Berlin's relationship to Salber is not clear. We believe the sales prices were somewhat high, but had some relationship to the fair market value. The financing was structured to provide petitioners with a tax benefit in exchange for cash. Petitioner financed both transactions with small cash payments and the remainder with stated recourse notes. Most of the purchase price is covered by installment notes that allow the interest-free deferral of note payments by petitioner for many years if the *288 lease payments are not made to petitioner. In addition, the installment notes provide for a reduction of note payments by petitioner against lease payments not made to him. The contract terms were designed to allow petitioners to obtain tax benefits with little or no risk. In each instance the sales to the middle company, then to petitioner, and leaseback to the original seller occurred on the same day. In addition, OPM declared bankruptcy and was in default. Both OPM and Sha-Li were often late with their payments. Most troubling are the residual value projections of the computer equipment after the leases expired. Petitioners provided testimony of two experts, Mr. Berlent and Mr. Minsky. Mr. Berlent was the only expert who made an appraisal at the time of the transactions. His appraisal reflected that the selling price of the equipment was fair market value, a reasonable estimate of the residual value of the equipment at the end of the lease was 20 percent of the selling price, and the equipment would have a useful life of more than 9 years from December 31, 1979. Mr. Berlent was hired and paid by the equipment sellers. He also knew the equipment selling prices before *289 he made his appraisals. His appraised values exactly coincided with the equipment selling prices. In his report Mr. Berlent acknowledged the announcement of the IBM 4300 series in January 1979, but failed to appropriately account for its effect. His report and testimony do not provide any information on how, if at all, the IBM 4300 series affected the IBM 370/158 and 370/168 series computers. His report, which was provided to OPM, Sha-Li, and eventually to petitioner, did not state what methodology he used to determine the residual value of the equipment. Mr. Berlent's appraisals of other equipment do not appear consistent with his opinion here. For example, he opined that similar equipment with lease expirations years apart has the same value. Moreover, the value he assigned to the Sha-Li IBM 370/158's was more than twice the value that he assigned on the previous day to the OPM IBM 370/158's. Mr. Minsky was the other expert for petitioner. Using some hindsight and "gut feel," Mr. Minsky also concluded that the residual value was 20 percent of the selling price. However, his report did not mention the IBM 4300 Series. He testified that the announcement of the new IBM 4300 *290 Series nearly a year before the subject transactions had no effect on the values of IBM 370/158 and 370/168 series computers. Mr. Minsky's values exactly mirrored those of Mr. Berlent. His report listed many factors; however, he was unable to explain how those factors affected his conclusion in this case. Respondent's only expert, Mr. Blumenthal, concluded that the purchase price of the OPM and Sha-Li equipment was overvalued by 30 percent and 8 percent, respectively. He concluded that the residual values of the equipment in December 1988 were basically limited to scrap value. Mr. Blumenthal's report appeared to consist of parts of several previously prepared reports. His report also appears to have been prepared in large part by Jonathan C. Moody and others. He was unable to identify the parts of his expert report that he personally prepared. He also apparently spent little time to analyze the fair market value and residual value for his report. He did so by relying upon the Computer Price Guide or Bluebook, and adding up the list prices for comparable equipment. He stated many factors, but was unable to indicate how they affected his valuation. He also did not consider *291 facts such as that the equipment was on lease, located, installed, and operated in a particular location by reputable end-users and subject to IBM maintenance. We have previously held that a lease premium of 15 percent is appropriate in determining the value of equipment on lease. Larsen v. Commissioner, 89 T.C. at 1268; Mukerji v. Commissioner, 87 T.C. at 967-968. We are not convinced by the opinions of the experts for either party. However, we are more concerned with petitioners' experts' failure to appropriately consider the effects of the introduction of newer and more powerful IBM computers, such as the IBM 303X and 4300 series, in analyzing the fair market and residual values of the subject computer equipment. We believe the newer computers reduced the fair market and residual values of the computer equipment at issue here. This is consistent with our findings in previous cases where, for example, we have found that the announcement of the IBM 4300 series had an immediate, drastic, and devastating effect on the fair market and residual values of earlier IBM computers. Larsen v. Commissioner, supra at 1243-1246; *292 Gefen v. Commissioner, 87 T.C. 1471, 1487 (1986); Coleman v. Commissioner, 87 T.C. at 198-199; B & A Distributing Co. v. Commissioner, T.C. Memo 1988-589; Ockels v. Commissioner, T.C. Memo 1987-507. See also Greenbaum v. Commissioner, T.C. Memo 1987-222. Petitioner paid cash in the amounts of $ 32,500 to Proz (Sha-Li transaction) and $ 72,500 to Beta (OPM transaction). He was obligated to make payments of principal and interest totaling $ 4,136,434.00 for the Sha-Li equipment and $ 5,605,898.60 for the OPM equipment. Thus, his total payments were to be $ 4,168,934.20 for the Sha-Li equipment and $ 5,678,398.60 for the OPM equipment. Petitioner was entitled to rental income of $ 3,856,886.40 for the Sha-Li equipment and $ 5,322,246.60 for the OPM equipment. Thus, to make a profit, petitioner would need to recover $ 312,047.80 (14.86 percent of the purchase price) for the Sha-Li equipment and $ 356,152 (12.28 percent of the purchase price) for the OPM equipment. These figures are understated in that they do not include costs such as accounting, legal, or brokerage fees, or sale *293 or lease of this equipment. Although we do not agree that scrap value was the only reasonable residual value, we cannot accept the values provided by petitioners' experts. After reviewing the expert opinions in this case, we believe the residual values of the subject equipment to be substantially less than 13 percent of the purchase price. In light of all the facts and circumstances of this case and the foregoing discussion, we believe four out of the five factors show that the computer equipment transactions lacked economic substance. The only factor not contrary to petitioner's position is our finding that the equipment purchase price had some relationship to its fair market value. 3. Business Purpose in a Sale and Leaseback Context
Because of our finding that petitioner's residual values were unreasonable, we also conclude that petitioners lacked sufficient business purpose. The Stacoms were nonuser recipients of tax benefits as a result of the sale and leaseback of computer equipment. A nonuser recipient of tax benefits in a sale and leaseback context must specifically establish that his entry into the transaction was motivated by a business purpose sufficient to *294 justify the form of the transaction, and that the transaction was supported by economic substance. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 201-203. Tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. Rice's Toyota World, Inc. v. Commissioner, supra at 196. The presence of a business purpose does not entitle a transaction to be recognized for Federal tax purposes where objective indicia of economic substance indicating a realistic potential for economic profit are not manifest. Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987). Specifically, in sale-leaseback transactions, the form of the transactions will be respected for Federal income tax purposes as long as the lessors retain significant and genuine attributes of traditional lessors. Frank Lyon Co. v. United States, 435 U.S. 561, 584, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978); Levy v. Commissioner, 91 T.C. at 853; Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). However, we must disregard sale-leaseback transactions *295 as economic shams where we find that investors entered into such transactions with the sole purpose of obtaining tax benefits and where the transactions are devoid of economic substance because no reasonable opportunity for economic profit existed, exclusive of tax benefits. Levy v. Commissioner, supra at 853-854; Torres v. Commissioner, 88 T.C. 702, 718 (1987), Rice's Toyota World, Inc. v. Commissioner, supra at 209-210; Estate of Thomas v. Commissioner, supra at 438-439. The focus of our inquiry is to perform an objective analysis of the transactions to determine whether any realistic opportunity for economic profit existed exclusive of the anticipated tax benefits. The business purpose test focuses on whether petitioner had an actual and honest profit objective. Rose v. Commissioner, 88 T.C. 386, 411 (1987), affd. 868 F.2d 851 (6th Cir. 1989). We analyze the transaction as would a prudent investor, Rice's Toyota World, Inc. v. Commissioner, supra at 209, but in conducting such an analysis we do not make unrealistic demands *296 for certainty. Gefen v. Commissioner, 87 T.C. 1471, 1492 (1986). Drawing a precise line of demarcation between valid and invalid transactions is invariably difficult. Rice's Toyota World, Inc. v. Commissioner, supra at 197. In this context, petitioners bear the burden of proof. Respondent's determination that the transaction was simply a tax-avoidance scheme devoid of economic substance is presumptively correct. Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Petitioners relied in large part upon expert testimony to show that they had a realistic opportunity for profit exclusive of tax benefits. In this case profit opportunity turns on whether the anticipated residual values of the computers at the conclusion of their leases were reasonable. As discussed above, we are not convinced that petitioners' anticipated residual values were reasonable. Thus, we are not persuaded that petitioners had a realistic opportunity to make a profit exclusive of tax benefits. In addition, while we believe it may be reasonable and prudent in certain circumstances to rely upon one's competent and capable spouse and a *297 professional financial adviser, we do not believe the taxpayer may hide behind such persons where, as here, there is no realistic opportunity to make a profit exclusive of tax benefits. We are not persuaded that petitioners or their agents ever intended or attempted to remarket or release the equipment. Here, we believe that the Stacoms had substantial income that they sought to shelter in a manner that would work. Claire Stacom asked their attorney and financial adviser, Mr. Berlin, about the computer transactions. Unfortunately, he directed them to a transaction that did not work. We think petitioners were primarily motivated by tax considerations. We hold that petitioners do not meet the threshold business purpose requirement. Having held that petitioners have failed to meet the threshold requirements of business purpose and economic substance, we need not reach the remaining issues except that which concerns the increased interest. 4. Increased Interest Under Section 6621(c)
Respondent determined that petitioners are liable for increased interest under section 6621(c). Section 6621(c) (formerly section 6621(d)) provides for an increase in the interest rate where *298 there is a substantial underpayment (an underpayment exceeding $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." The increased interest is effective as to interest accruing after December 31, 1984 (the date of enactment of the original section 6621(d)), even though the tax-motivated transaction was entered into prior to that date and regardless of the date the return was filed. H. Rept. 98-861 (Conf.), 1984-3 C.B. (Vol. 2) 1, 239; Solowiejczyk v. Commissioner, 85 T.C. 552, 555-556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c)(3)(A)(V) defines a tax-motivated transaction as any sham or fraudulent transaction. Having found that petitioners entered into computer sale and leaseback transactions that are without economic substance, we hold that they are liable for increased interest under section 6621(c). To reflect concessions of both parties, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩